**John S. ATLEE et al.**

**v.**

**Melvin LAIRD, Individually and as Secretary of Defense, et al.**

**Fred R. BERNATH et al.**

**v.**

**Richard M. NIXON, Individually and as President of the United States, et al.**

**Civ. A. Nos. 71-2324, 72-891.**

United States District Court,
E. D. Pennsylvania.

Aug. 7, 1972.

Dissenting Opinion Aug. 21, 1972.

David Kairys, David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., Victor Rabinowitz, Michael Krinsky, Rabinowitz, Boudin & Standard, New York City, Jack Wysoker, Perth Amboy, N. J., for plaintiffs.

Louis C. Bechtle, U. S. Atty., Carl J. Melone, Warren D. Mulloy, John T. Thorn, Asst. U. S. Attys., Philadelphia, Pa., Harlington Wood, Jr., Asst. Atty. Gen., Harland F. Leathers, G. Michael Fenner, Dept. of Justice, Washington, D. C., for defendants.

Harold E. Kohn, Stuart H. Savett, Donald L. Weinberg, Philadelphia, Pa., for intervenor plaintiffs.

Before ADAMS, Circuit Judge, LORD, III, Chief District Judge, and HUYETT, District Judge.

ADAMS, Circuit Judge.

Historically, the power of the federal courts to adjudicate disputes has been delimited by constitutional and legislative constraints, such as the "case or controversy" test set forth in the Constitution and the "amount in controversy" standard established by Congress. In addition, there have been restraints developed by the courts themselves, such as the "political question" doctrine.

This case places before us the issue whether the Court having jurisdiction of the dispute ought to proceed to adjudicate it or ought to eschew this task on the ground that the matter constitutes a political question.

The seven named plaintiffs in this suit filed a class action on September 24, 1971 [1] asking that a three-judge district court be convened for the purpose of determining the constitutionality of the war in Southeast Asia. Specifically, they have alleged that American participation in, and the expenditure of funds for, the war contravene various constitutional provisions, and that the conduct of the war is violative of the treaties to which the United States is a signatory. Plaintiffs have asked this Court essentially to declare the illegality of the war and to enjoin permanently the expenditure of funds supporting the war, the spending of money for weapons that may be found illegal under the international rules of war, and the use of military tactics that may violate those rules.

On behalf of the defendants here, the Government filed a motion with the single-judge court to dismiss. With regard to the President, the district judge granted the motion, D.C., 336 F.Supp. 790. However, in an opinion carefully delineating those issues which the single judge, as opposed to the three-judge court, had the power to consider, the motion pertaining to the Secretary of Defense was denied, D.C., 339 F.Supp. 1347.[2] Status as amici curiae has been granted to a number of groups, and this Court now has pending before it a motion to intervene as plaintiffs filed by several individuals of, or approaching, draft age that we hereby grant, and the Government's motion to dismiss, or in the alternative to dissolve, the three-judge court.

The Government has advanced four grounds for dismissing the complaint [3], but at oral argument relied primarily on the contention that the case is nonjusticiable because it asks this Court to decide a political question. In view of the result reached, we consider only the justiciability issue.

---

1. An amended and supplemental pleading has been filed by the plaintiffs, and for purposes of this opinion, that pleading is the only one relevant.

2. The order convening this Court, though, made clear that no grounds for dismissal had been foreclosed by the decision of the single judge.

3. (1) The plaintiffs lack standing. (2) The case involves a nonjusticiable political question. (3) The suit is, in effect, against the United States, and no consent has been given. (4) The plaintiffs have failed to state a claim upon which relief may be granted.

## I. BACKGROUND OF POLITICAL QUESTION DOCTRINE

An analysis of the political question doctrine should first recognize that the judiciary clause of the Constitution gives no explicit support to the theory that federal courts may properly decline to hear cases or decide particular issues merely because they involve political questions. The relevant provision contained in Art. III, Sec. 2 is that the judicial power shall extend to cases and controversies. No mention is made that certain disputes otherwise subject to the judicial power should not be adjudicated.

However, the political question doctrine was recognized before the enactment of the Constitution and frequently by the Supreme Court in the period shortly after the adoption of the Constitution.[4]

In the landmark case of Marbury v. Madison, 1 Cranch (5 U.S.) 137, 165–166, 2 L.Ed. 60 (1803), deciding whether the refusal of the Secretary of State to deliver commissions appointing justices of the peace was reviewable by the federal courts, Chief Justice Marshall stated that the question whether the legality of an act of the head of a department be examinable must depend on the nature of that act. He continued that if some acts be examinable, and others not, there must be some rule to guide the court in the exercise of its jurisdiction; that there may be difficulty in applying the rule in particular cases; but there cannot be much difficulty in laying down the rule. He then added:

"By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

"In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive." Id. at 165–166.

Thus, Marbury may be considered the genesis of the political question doctrine in the federal courts.[5]

---

4. Maurice Finkelstein, in Judicial-Self-Limitation, 37 Harv.L.Rev. 338 (1923), cites a number of early cases recognizing the doctrine that courts will not adjudicate cases involving the monarch or other sovereign. Included are a suit by the Duke of York to have himself declared the rightful heir to the throne, Duke of York's Claim to Crown, 5 Rotuli Par. 375, Wambaugh Cases on Constitution, 1, 3 (1460) ; and a suit to resolve the conflicting boundary claims of Lord Baltimore and William Penn in connection with their holdings in America. Penn v. Lord Baltimore, 1 Ves. 444 (1750). Shortly after the Constitution was adopted, the Justices of the Supreme Court were asked to render an advisory opinion. Describing their reply, Chief Justice Marshall stated: "Considering themselves merely as constituting a legal tribunal for the decision of controversies brought before them in legal form, these gentlemen deemed it improper to enter the field of politics by declaring their opinion on questions not growing out of the case before them." Marshall, Life of Washington (1807), quoted in Bickel, The Least Dangerous Branch 114 (1962).

5. Chief Justice Marshall appeared to negate this view regarding political questions, when in Cohens v. Virginia, 6 Wheat. (19 U.S.) 264, 404, 5 L.Ed. 257 (1821), he reasoned:

"It is most true that this Court will not take jurisdiction if it should not: but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is

## II. CASE BY CASE DEVELOP-MENT OF THE POLITICAL QUESTION DOCTRINE

The first case to discuss in detail the application of the political question doctrine was Luther v. Borden, 7 How. (48 U.S.) 1, 12 L.Ed. 581 (1849).[6] Luther brought a trespass action against Borden and others for breaking and entering Luther's house. Borden defended on the grounds that an insurrection to overthrow the government of Rhode Island was taking place, that martial law had been declared by the General Assembly, that Luther was aiding and abetting the insurrection and that the defendants were members of the local infantry ordered to arrest the plaintiff and if necessary to break and enter his dwelling. Luther's reply was based on the assertion that prior to the acts complained of, the government, under whose authority his house was broken into, had been displaced by the people of Rhode Island, and that Luther was acting in support of the new government. The form of the original charter government of Rhode Island had not been significantly changed since its inception in 1663. By 1840, a number of citizens led by Dorr were disenchanted with the existing form of government and called a convention, unauthorized by the legislature, to write a new constitution to be submitted to the people. After the votes were returned, the convention declared the new constitution to be adopted, and communicated the decision to the governor so that he might place it before the charter legislature. In addition, the convention ordered elections for various state posts, and the representatives thus elected organized a new government to supercede that established by the charter.

With this factual background, the Supreme Court was asked to decide which of the two Rhode Island governments was legitimate. This they refused to do. Rather, they examined the decisions of the Rhode Island Supreme Court and concluded that they were bound by that court's interpretation of the Rhode Island laws and constitution. And when confronted with the suggestion that they make their own determination based on the right of the people to a republican form of government, the Court answered that the Constitution reposes the protection of that right solely with the legislative and executive—the political—branches of the federal government.

The Court justified on a number of grounds its refusal to decide the question of legitimacy on the merits. First,

given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty."
Marshall, however, later made clear, in Cherokee Nation v. Georgia, 5 Pet. (30 U.S.) 1, 20, 8 L.Ed. 25 (1831), that the political question doctrine was an exception to the rule set forth in Cohens v. Virginia:
"But the court is asked to do more than decide on the title. The bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interpretation by the court may be well questioned. It savors too much of the exercise of political power to be within the proper province of the judicial department."

6. Two prior decisions had to some extent relied on the doctrine. Foster v. Neilson, 2 Pet. (27 U.S.) 253, 7 L.Ed. 415 (1829) involved the title to land which plaintiff clamied under an 1804 Spanish land grant. The Court found for the defendant, in part because both the legislative and executive branches had taken the position that grants such as plaintiff's were presumptively void. In Williams v. Suffolk Ins. Co., 13 Pet. (38 U.S.) 415, 10 L.Ed. 226 (1839), plaintiff sued for the loss of a ship and cargo, and the defense relied on the ship master's negligence in taking seals on the Falkland Islands when he knew that the government of Buenos Aires claimed jurisdiction over the islands and had demanded that he refrain from taking seals. The Court held that since the Executive had repeatedly asserted that the Falklands were open for seal taking, it would not interfere with that determination.

there were no criteria by which a federal court could determine who should be eligible to vote on the question which government ought to be recognized. More importantly, the Court held that, by its terms, Article 4, Section 4 of the Constitution committed to Congress the decision whether a particular government is the established one in a State. Concluding its opinion, the Court stated:

"Much of the argument on the part of the plaintiff turned upon political rights and political questions, upon which the court has been urged to express an opinion. We decline doing so. The high power has been conferred on this court of passing judgment upon the acts of the State sovereignties, and of the legislative and executive branches of the federal government, and of determining whether they are beyond the limits of power marked out for them respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction. And while it should always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums." 7 How. (48 U.S.) at 46–47, 12 L.Ed. 581.

The holding of Luther v. Borden that the Guarantee Clause presents a political question has been reaffirmed time after time by the Supreme Court.[7]

Although not specifically dealing with the political question principle, the Prize Cases, 67 U.S. 635, 17 L.Ed. 459 (1863), relied upon by the plaintiffs, are instructive in tracing the development of the doctrine. In April, 1861, President Lincoln declared a blockade against the states making up the Confederacy, and shortly thereafter several ships were seized by federal vessels, taken to Northern ports, and claimed as prizes. The issues before the Supreme Court were whether the President had the power to declare the blockade, and if so, whether the property of residents of the blockaded states was "enemy" property. The Court began by stating the general rules that the President, as Commander-in-Chief, is the proper person to declare a blockade, and that a blockade is justified when a state of war exists *de facto*. The Court then noted it was factually beyond dispute that with the firing on Fort Sumter, a state of civil war did exist, and that it was the duty of the President to protect the Nation from invasion. Therefore, the President had the power to blockade Southern ports.

The dissent viewed the question differently and stated that without a formal declaration of war the President was powerless to act. One might conclude, then, that questions concerning the war-making powers of the President and Congress do not fall within the political question doctrine on the assumption that the majority must have considered these issues on the merits. Such a suggestion overlooks the fact, however, that the majority rested its holding on the existence of actual hostilities and not on a declaration of war in the constitutional sense. The position of the minority, that a federal court may properly examine on the merits the scope of the war-making powers of the political branches in other than a case of conflict between the actions taken by both branches, has simply never been the law. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

Shortly after the Civil War was terminated, the Court was called upon to

---

7. *See, e. g.* Highland Farms Dairy v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1937) ; Ohio ex rel. Bryant v. Akron Metropolitan Park Dist., 281 U.S. 74, 50 S.Ct. 228, 74 L.Ed. 710 (1930) ; Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917) ; O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249 (1915) ; Marshall v. Dye, 231 U.S. 250, 34 S.Ct. 92, 58 L.Ed. 206 (1913) ; Pacific States Tel. Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912).

enjoin the President from executing and carrying out the Reconstruction Acts on the ground that the legislation was unconstitutional. In Mississippi v. Johnson, 71 U.S. 475, 4 Wall 475, 18 L.Ed. 437 (1866), it refused to do so. The case can be read narrowly to suggest that because the actions of the President in enforcing Congressional enactments are discretionary and not merely ministerial, the President may not be enjoined from carrying out a particular law. A closer reading of the case, however, indicates that the reasons stated by the Court for its holding are analogous to those already developed in the political question field: the Constitution reposes execution of the laws in the President. Were the courts to interfere, a constitutional crises might ensue. This is so because if the President were enjoined, the courts would not possess the power to command obedience by the President; and if the President were to obey the injunction and Congress subsequently impeached him, the courts would be required to protect the President by enjoining the impeachment—a "strange spectacle." Thus, the immunity of the President from such injunctions draws its essence from the separation of powers concept rather than from the technical distinction between discretionary and ministerial acts.[8]

Later in the 19th century, the Supreme Court began to apply the developing political question doctrine to specific factual settings. In re Baiz, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222 (1890), held that federal courts did not have the authority to review the refusal of the Department of State to issue immunity papers to the general consul of a foreign nation because the executive alone possessed the power.

Two years later the Court was confronted with a case in which importers protested the assessment of a duty on the basis that the legislation authorizing the tax as printed differed from that passed by the House and Senate. Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892). After noting that the enrolled act carried the signatures of the Speaker of the House, the President of the Senate, and the President of the United States and was in the custody of the Secretary of State, the Supreme Court held that the authenticity of the bill could not be attacked.

The next case of significance in particularizing the development of the political question doctrine is Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918). In dispute was the ownership of a large cargo of hides that the plaintiff claimed as the assignee of Martinez & Co., an enterprise doing business in Torreon, Mexico, and to which the defendant asserted title based on a purchase from a Texas company.

Following the commencement of a revolution in Mexico in 1913, in which General Carranza eventually succeeded in ousting the Huerta regime, General Villa was placed in command of the northern Carranza forces. After capturing the city of Torreon, Villa proposed levying a military contribution on the citizens to support his army. Following negotiations, terms were reached. However, one Huerta follower had fled the city and failed to pay his assessment. Villa confiscated the hides in payment and eventually sold them to the Texas company. The assignee of the individual from whom the hides were seized brought suit to regain them on the theory that the Villa assessment violated the terms of the Hague Convention.

The Supreme Court took judicial notice of the fact that the President had recognized the Carranza government *de facto* in 1915 and *de jure* in 1917, and that such recognition is retroactive.

---

8. Similarly in Georgia v. Stanton, 73 U.S. 50, 6 Wall 50, 18 L.Ed. 721 (1868), the Court ruled that Georgia's attack on the constitutionality of legislation which terminated the existing state government and substituted therefor a military regime presented a nonjusticiable political question.

The Court refused to inquire beyond this act of the executive because

"The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Id. at 302, 38 S.Ct. at 311.

■ Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), on the other hand, made clear that merely because the political process may in some way be implicated in the issues of a law suit, it does not follow that a federal court lacks jurisdiction because of the political question doctrine. As Justice Holmes stated, for a unanimous Court:

"The objection that the subject-matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years . . ." Id. at 540, 47 S.Ct. at 446.[9]

■ The critical distinction between political questions as they relate to purely domestic affairs and those relating to foreign affairs was emphasized in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). In 1934, Congress passed a resolution that if the President found that the prohibition of selling arms to countries involved in fighting in the Chaco would help re-establish peace there, it would be a crime to sell such weapons. On the same day, the President made the required finding in the form of a proclamation, and in 1936, the defendant was indicted for having made prohibited sales. One of the challenges to the prosecution was based on the assertion that the Congress had delegated powers to the President unconstitutionally. As a preliminary observation, the Court noted,

"The whole aim of the resolution is to affect a situation entirely external to the United States, and falling within the category of foreign affairs. * * * In other words, assuming (but not deciding) that the challenged delegation, if it were confined to internal affairs, would be invalid, may it nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory?" Id. at 315, 57 S.Ct. at 218.

The Court then undertook a detailed examination of the evolution of the nation's powers as a sovereign in foreign affairs, in contradistinction to those powers derived through the Constitution from the States, and concluded that even without specific constitutional authorization, the political branches would have broad powers, not subject to examination by the judiciary, in the field of foreign relations.

"It is enough to summarize by saying that, both upon principle and in accordance with precedent, we conclude there is sufficient warrant for the broad discretion vested in the President to determine whether the enforcement of the statute will have a beneficial effect upon the re-establishment of peace in the affected countries * * *" Id. at 329, 57 S.Ct. at 225.

Therefore, it appears that when the conduct of the foreign relations of the country is at stake, courts will be more hesitant to consider certain issues on the merits than when internal operations are involved.

A variation on the enrolled bill doctrine enunciated in Field v. Clark, supra, arose in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), when one of the questions presented was wheth-

9. See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (discussed in detail infra).

er the Constitution permitted the legislature of a state, once it had rejected ratification of a proposed amendment, to vote again and pass the amendment. In answer, the Court stated,

"We think that in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the amendment." *Id.* at 450, 59 S.Ct. at 980.

In its application of the political question doctrine, the Supreme Court, in 1943, was faced with facts the obverse of In re Baiz, *supra.* The filing of a libel against a ship owned by Peru triggered the controversy in Ex Parte Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943). The State Department, after permitting Peru's claim of immunity for its vessel, filed a certificate to that effect with the district court having in rem jurisdiction over the ship. That court found a waiver of immunity by Peru, and the Supreme Court, in an opinion supporting the issuance of a writ of prohibition against the district court, held

"The certification and request that the vessel be declared immune must be accepted by the courts as a conclusive determination by the political arm of the Government that the continued retention of the vessel interferes with the proper conduct of our foreign relations. Upon the submission of this certification to the district court, it became the court's duty, in conformity to established principles, to release the vessel and to proceed no further in the cause." *Id.* at 589, 63 S.Ct. at 800.

Once again, because any interference by the judiciary might have led to untoward consequences in our foreign relations, the Supreme Court recognized the necessary limitations on the exercise of its power to adjudicate certain questions.

The extreme hesitancy of courts to enter the thicket of foreign relations or a field bearing on foreign affairs was vividly pointed out in C. & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S. Ct. 431, 92 L.Ed. 568 (1948). The Civil Aeronautics Board (C.A.B.) had, in deciding between competing applications for foreign air routes, granted C. & S. the certificate and denied it to Waterman. Pursuant to the terms of the relevant statute, the President had given his express approval to the C.A.B.'s decision. Waterman sought review of the order in the court of appeals, and both C. & S. and the C.A.B. requested a Supreme Court determination whether the court of appeals properly refused to dismiss Waterman's petition.

Because of the peculiar nature of the enabling legislation, the Court first held that, prior to Presidential approval or disapproval, any ruling of the C.A.B. with regard to foreign air routes was not final and therefore not ripe for review. More important in terms of the political question doctrine was the Court's second holding that once the President gave his approval to the C.A.B. decision, thereby making it a final order, no court could review it because it presented a political question dealing with foreign affairs. The Court reasoned:

"[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. (They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.) They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.* at 111, 68 S.Ct. at 436.

Thus, the teaching of the *Waterman* case is that even in the field of administrative

review, one traditionally undertaken by courts, the federal judiciary should not adjudicate questions of foreign policy.

Further describing the judicial restraint necessitated by questions of foreign affairs is Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948). Ludecke, a German resident alien, sought to prevent his removal from the United States as an alien enemy under a 1798 statute giving the President the right to remove alien enemies during a declared war. Because hostilities had ceased between the United States and Germany, Ludecke asserted that his removal was unlawful. The Court announced: " 'The state of war' may be terminated by treaty or legislation or Presidential proclamation. Whatever the mode, its termination is a political act." Id. at 168, 68 S.Ct. at 1433. Therefore, the Court concluded, in the absence of a "political act" ending the war, it was powerless to so declare. Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), dealt with still another of the foreign policy-making functions of the political branches of government. As one of the bases for requesting a writ of habeas corpus, petitioner, a non-resident alien enemy who had been tried and convicted of war crimes by a United States Military Commission in China, asserted the illegality of the presence of American troops in China. The Court responded (p. 789, 70 S.Ct. p. 349):

"Certainly it is not the function of the Judiciary to entertain private litigation—even by a citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region. China appears to have fully consented to the trial within her territories and, if China had complaint at the presence of American forces there, China's grievance does not become these prisoners' right. The issue tendered * * * involves a challenge to conduct of diplomatic and foreign affairs, for which the President is exclusively responsible. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, [57 S.Ct. 216, 81 L.Ed. 255]; Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, [68 S. Ct. 431, 92 L.Ed. 568."

Against this background of decisions, the Supreme Court, in the last ten years, has decided two cases which may appear to be an appropriate description of the contours of the political question doctrine.

In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Tennessee voters sought to have declared unconstitutional that state's apportionment of both houses of its legislature on the ground that it violated their rights to equal protection. On the authority of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), the lower court had dismissed the complaint as presenting a non-justiciable political question. Writing for a plurality of the Court, Justice Brennan first held that the Court had jurisdiction over the subject matter of the suit and then reasoned that the plaintiffs had standing to maintain the action.

In an extensive discussion of the political question doctrine, with particular emphasis on Colegrove and the other Guarantee Clause cases, supra note 7, the Court concluded that a justiciable issue is presented when a voter bases his claim for relief on the Equal Protection Clause without necessarily relying on the Guarantee Clause.

■ As an initial premise of the analysis of the political question doctrine, the opinion stated:

"Our discussion, even at the price of extending this opinion, requires review of a number of political question cases, in order to expose the attributes of the doctrine—attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness." Id. 369 U.S. at 210, 82 S.Ct. at 706.

Attempting to bring direction from disorder, Justice Brennan categorized the decisions to show the slightly different

rules applicable to each.[10] Subject to particular scrutiny by the Court were those cases dealing with the Republican form of government because of the line of cases, including *Colegrove,* holding that attacks on apportionment presented non-justiciable political questions. The Court held that Baker's claim was distinguishable from those held to be political in the *Colegrove* line of cases in that it "neither rests upon nor implicates the Guaranty Clause * * * [because appellants] claim that they are being denied equal protection * * * ". *Id.* at 209, 82 S.Ct. at 706. Perhaps the key to the result in Baker, though, may be found in the statement that, "in the Guarantee Clause cases and in the other 'political question' cases, *it is the relationship between* the judiciary and the coordinate branches of the *Federal Government,* and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' " *Id.* at 210, 82 S.Ct. at 706 (emphasis added). Put another way, under Mr. Justice Brennan's approach, the political question doctrine rests not upon concepts of federalism but rather upon the structure of our national government—the separation of powers.

The Court then formulated a six-pronged test for determining whether an issue constitutes a political question:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of govern-

ment; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment for multifarious pronouncements by various departments on one question." *Id.* at 217, 82 S.Ct. at 710.

After determining that the case under consideration did not fit into any of the six classifications, the Court held that the issues presented by the complaint were justiciable and remanded the case for a trial.

Later, in Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.E.2d 491 (1969), the Supreme Court heard the suit of a Congressman contesting his exclusion from the 90th Congress. Powell, who fit the qualifications set forth in Art. I, Sec. 2, cl. 2, was duly elected a member of the House of Representatives. The House voted to exclude him on the basis of alleged misconduct. When the case reached the Court, Powell had already been seated in the 91st Congress, and, thus, a question of mootness arose. Because the matter of Powell's salary for the 90th Congress remained for decision, the Court held that the case was not moot and proceeded to discuss the justiciability of a question concerning the power of the House to exclude a duly elected member under Article I, Sec. 5.

After an exhaustive review of the history of the section, Chief Justice Warren, writing for the Court, concluded that, under the first test of *Baker* (a textual commitment of the issue to a coordinate branch), the question involved was not political because by virtue of the Constitution the House has the right to exclude a member only if he does not satisfy one of the tests of Article I, Sec. 2, cl. 2.[11] The Court stated that the Constitution does not give the House the power to exclude *for any cause not specified in that section.*

---

10. The groupings included foreign relations, dates of duration of hostilities, validity of enactments, the status of Indian tribes, and republican form of government.

11. A member of the House must be 25, a citizen for at least seven years, and at the time he is chosen, an inhabitant of the State from which he is elected.

Applying a two-step process to determine justiciability,[12] the Court found that the question was justiciable and that the House had exceeded its authority. The Court then ordered that a declaratory judgment issue from the district court and that Powell's claim for back pay be considered there. It is important to note that the Court did not intimate what result would have followed if the House had excluded Powell for failure to meet any of the three specifications of Article I, Sec. 2, cl. 2. And as noted in Justice Douglas' concurring opinion, 395 U.S. at 553, 89 S.Ct. 1944, had the House seated Powell and then expelled him by a two-thirds vote, a grave question of justiciability would have been raised. Thus *Powell* affirmed the validity of the six-point *Baker* test, at least so far as domestic problems are concerned, and remains the most current detailed statement by the Supreme Court on the political question doctrine.[13]

Very recently, the Supreme Court again faced the question of justiciability in O'Brien v. Brown, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), which involved the propriety of certain decisions of the Credentials Committee of the Democratic National Party, prior to the National Convention's taking action on the recommendations. In granting stays of orders that would have overruled the Credentials Committee and essentially removed from the Convention the decision whether to seat challenged delegates, the Court reaffirmed the viability of the political question doctrine.[14] Although not squarely deciding the issue of justiciability, the Court in O'Brien cited Luther v. Borden, *supra*, and concluded its comment on political questions with the statement:

"While the Court is unwilling to undertake final resolution of the important constitutional questions presented without full briefing and argument and adequate opportunity for deliberation, we entertain grave doubts as to the action taken by the Court of Appeals." *Id.* at ——, 92 S.Ct. at 2720.

Therefore, to the list of issues not considered justiciable, we may now be required to add the seating of delegates to national political conventions.

## III. PRINCIPLES TO BE DRAWN FROM THE CASES

As Justice Brennan observed in Baker v. Carr, *supra*, the political question doctrine does not appear to have consistent attributes, but rather, as a grouping of considerations, applies with differing emphasis in various phases of the law. Because the task has been performed once before,[15] it is unnecessary here to set forth the rules apposite in determining justiciability at least in fields other than foreign relations. Of course, the cases from other than the foreign policy area do highlight the common concerns that arise whenever a potential

---

12. "First, we must decide whether the claim presented and the relief sought are of the type which admit of judicial resolution. Second, we must determine whether the structure of the Federal Government renders the issue presented a 'political question'—that is, a question which is not justiciable in federal court because of the separation of powers provided by the Constitution." *Id.* 395 U.S. at 516–517, 89 S.Ct. at 1961.

13. In Massachusetts v. Laird, 400 U.S. 886, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970), the Supreme Court denied a motion by the Commonwealth of Massachusetts for leave to file an original bill of complaint. Justice Douglas dissented on the grounds that the Commonwealth had standing and

that the issues appeared to be justiciable. Justices Stewart and Harlan also dissented, but on the ground that the Court should have heard arguments on standing and justiciability. See also, Mora v. McNamara, 389 U.S. 934, 88 S.Ct. 282, 19 L.Ed.2d 287 (1967) (dissenting opinions of Stewart, J., and Douglas, J.).

14. At least one commentator had written that *Powell* completely undermined the doctrine. The Supreme Court 1968 Term, 83 Harv.L.Rev. 7, 68 (1969). The discussion of political questions in *O'Brien* should serve to dispel any notion that the doctrine has disappeared.

15. Baker v. Carr, *supra* 369 U.S. at 211–218, 82 S.Ct. 691.

political question is broached in the federal courts.

█ The precept that federal courts do not decide political questions does not arise, as already noted, from the text of the Constitution. It is instead a rule born of pragmatic considerations, based on the separation of powers concept and our system of checks and balances. Unlike general concepts of justiciability stemming from the constitutional "case and controversy" restriction on judicial power, the political question doctrine limits the exercise, not the existence, of federal judicial power. Thus, even though a dispute may constitutionally be subject to the judicial power, if a political question is present, a federal court should decline to reach the merits. *Cf.* Powell v. McCormack, *supra,* 395 U.S. at 516–517, 89 S.Ct. 1944.

Beyond these generalizations, one principle which appears to have emanated clearly concerns the distinction between those cases dealing with foreign affairs and those dealing with internal affairs. *See, e. g.,* United States v. Curtiss-Wright Corp., *supra*; Oetjen v. Central Leather Co., *supra.* Having made this observation, it would, of course, be facile merely to put to one side those cases involving internal matters which either specifically hold that the doctrine is not a bar to adjudication [16] or, without discussing the doctrine, reach the merits of the controversy.[17] A brief discussion, however, should be sufficient to point out the very different considerations involved in these cases, and to demonstrate the need for federal courts to move with extreme caution in the sensitive area of foreign policy.

The *Steel Seizure Cases*,[18] because of their supposed relevance to this country's participation in the Korean conflict,

perhaps went farthest in adjudicating an issue having potential repercussions beyond the normal judicial sphere. By April, 1952, it had become clear that an agreement would not be reached between steel manufacturers and their employees, and that a general strike in the industry would ensue. The President, after deciding that such a strike would gravely threaten national security, issued a proclamation directing the Secretary of Commerce to seize the steel mills and operate them until a settlement of the labor altercation was effectuated. The seized companies brought an action to enjoin the takeover on the ground that the President did not possess authority under the "war power" to order that an industry be nationalized. Reaching the merits of the controversy,[19] the Supreme Court held that because such power had not been conferred upon the President by the Constitution, and, in addition had been denied to him by the Congress in refusing to delegate the authority, the seizure should be enjoined.

Several important factors must be considered in order to understand the impact of this decision. During the First World War, all of the eleven industrial seizures by President Wilson were, at least arguably, pursuant to specific Congressional authorization. Congress had refused to grant such authorization to President Truman. Moreover, although the executive had argued that the seizures were related to the war power, in essence the President was obtruding into the field of labor relations, an area traditionally assigned to the Congress. Even though the nationalization and the Court's injunction of the President's action might have had some, although indirect, effect on the foreign relations of this country, such import, if any, would have been clearly minimal compared to

---

16. Powell v. McCormack, *supra*; Baker v. Carr, *supra*; Nixon v. Herndon, *supra.*

17. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ; The Prize Cases, *supra.*

18. 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

19. The opinion of the Court never referred to the political question doctrine, and so far as can be determined, the Government never asserted that the doctrine should be applied.

the drastic change which nationalization by the President would otherwise have brought about in the free enterprise system.

■ Contrasting the *Steel Seizure* case with *Curtiss-Wright, supra,* for example, clearly reveals the different set of considerations raised by foreign relations cases. In *Curtiss-Wright,* the challenged Presidential Proclamation, in attempting to ease the tension in the Chaco, applied to a state of affairs external to the United States. The Proclamation also had a marked internal effect, however, in that American citizens could be prosecuted and convicted for the illegal sale of weapons to be used in the Chaco. The Supreme Court could have reversed Curtiss-Wright's conviction merely by interpreting the Necessary and Proper Clause to vest only in Congress, and not the President, the power to make certain acts criminal. It did not do so, though, for a number of compelling reasons. The Constitution commits to the President all the foreign policy powers of this country with the exception that the Senate must approve treaties. It was for the President to determine the position of the United States with regard to the hostilities in the Chaco. Congress by authorizing the Proclamation, gave the President an additional implement for carrying out the policy of attempting to bring peace to the Chaco. And most important, a court, faced with the task of review, could not have before it all the data necessary for making the judgment or predicting what effect its decision would have on our foreign relations, even though the constitutional question presented— the possible usurpation of legislative powers by the executive—is one normally within the competence of federal courts.[20]

■ In several respects, then, issues dealing with the foreign affairs of this country are distinguishable for the purpose of applying the political question doctrine, from those primarily concerning internal operations. First, the potentially relevant information in a foreign policy case comes from a multitude of sources—both domestic and foreign —and might, by sheer bulk alone, be unmanageable for a court. In addition, there is the very real possibility that the parties might not assemble all the data, in which case any attempt by the court to justify a decision on the merits of an issue having so profound an effect on the nation would be both difficult and unwise. Such a related problem concerns confidentiality. In certain instances, it would surely be conceded, the information necessary to a reasoned judgment should remain confidential. If, because of confidential information, not all the facts could be evaluated, any adjudication of a case whose decision might adversely affect this country's international posture would be imprudent. *See* C. & S. Airlines v. Waterman S. S. Co., *supra.*

A second major element concerns the inherent inability of a court to predict the international consequences flowing from a decision on the merits. The Court in Oetjen v. Central Leather Co., *supra,* 246 U.S. at 304, 38 S.Ct., at 311, noted that, "To permit the validity of the acts of one sovereign state to be re-examined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of the nations.'" In contrast, when the Supreme Court decided the *Prize Cases, supra,* on the merits, it dealt with the decision to seize ships, possibly carrying foreign flags, made by the executive whose role in making the initial decision included assessing any adverse effects on our international standing.

Another crucial factor in the foreign affairs field is the possible absence of any standards for a court to apply in reaching a judgment on the merits. Referring again to *Oetjen,* we might ques-

---

20. *See also,* C. & S. Airlines v. Waterman S.S. Co., *supra,* where, because of the executive's important foreign policy functions, the Court refused to intervene in the administrative process on the ground that courts should not interfere.

tion where the court would look for applicable standards and, even assuming that appropriate standards could be found, whether a court has the competence to decide which foreign government ought to be recognized.

Finally, it should be noted whenever the foreign policy of this nation is brought into issue in the context of a legal dispute, the court hearing the case is confronted with the task of reviewing an initial determination made by the political branches, individually or in concert, and committed by the Constitution to those branches for resolution.

Having drawn from the foreign affairs cases decided by the Supreme Court these factors for special consideration, we are not unmindful of the six-point *Baker* test, referred to in Powell v. McCormack, *supra*. Whereas in *Powell*, a case concerning domestic affairs, the primary thrust of the political question discussion naturally centered on the textual commitment test, our examination of the authorities leads to the conclusion that, (when dealing with a foreign policy case, the court should focus its attention primarily on the other factors discussed above and crucially important in the foreign affairs area.[21])

## IV. APPLICATION OF THE PRINCIPLES TO THE PRESENT CASE

The plaintiffs here have alleged that the United States is involved in a "war" in Southeast Asia; that it is the sort of war Congress must declare; that Congress has issued no formal declaration of war; that absent such declaration, the President is acting unconstitutionally in keeping American forces in Southeast Asia; and that, therefore, this Court should enjoin all expenditures relating to the war.[22]

A decision on the merits would require resolution of the following issues, among others: (1) whether our military participation in Southeast Asia ought to be classified as a "war";[23] (2) whether, assuming a formal declaration of war is for some reason unnecessary, Congress has taken sufficient action to authorize the "war"; and (3) whether the President, under his war powers and regardless of congressional action, has the authority to keep American forces in that area. Our task now is to decide whether any or all of these questions are political, and, therefore, non-justiciable.

A number of lower federal courts, dealing with these inquiries, have come to a variety of conclusions concerning the ap-

21. In fact, our analysis is not inconsistent with the Court's discussion of foreign relations in Baker v. Carr, *supra*, 369 U.S. at 211–212, 82 S.Ct. at 707:
"There are sweeping statements to the effect that all questions touching foreign relations are political questions. Not only does resolution of such issues frequently turn on standards that defy judicial application or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views. Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to ju-

dicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." (Footnotes omitted.)

22. Alternatively, plaintiffs suggest that even if the Constitution does not require a formal declaration of war, Congress has not, merely by appropriating funds and extending the draft, taken sufficient steps to authorize the military action.

23. If the conflict is not a war, it would not be rational to conclude that the Constitution requires a congressional declaration of war to legitimate the presence of our armed forces abroad and the expenditure of funds to support the troops. Johnson v. Eisentrager, *supra*. At least one state court has held that, for purposes of life insurance, our engagement in Vietnam is not a war. Jackson v. North America Assurance Soc., 212 Va. 177, 183 S.E.2d 160 (1971).

**704**

plicability of the political question doctrine.

In Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664 (1967), the court held that any attack on the constitutionality of the war presented a political question. In a per curiam opinion, it stated, "The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive." *Id.* at 665–666.

In deciding a similar question, Judge Wyzanski, in United States v. Sisson, 294 F.Supp. 511, 515 (D.Mass.1968), considered only the question of the necessity for a congressional declaration of war. Because there was no assertion that Congress had acted in a manner inconsistent with the deployment of American troops in Southeast Asia, he concluded, "that the distinction between a declaration of war and a cooperative action by the legislative and executive with respect to military activities in foreign countries is the very essence of what is meant by a political question." He therefore declined to examine whether Congress had taken positive steps equivalent to a declaration of war.

The Second Circuit appears to have gone one step further in considering the justiciability of attacks on the constitutionality of the war in Vietnam. In Orlando v. Laird, 443 F.2d 1039 (2d Cir. 1971), the court held justiciable the question whether Congress need take some action to authorize the war. Reasoning that a federal court always has the power, if not the duty, to interpret the Constitution, in this case Art. I, Sec. 8, Cl. 11, and examining monetary appropriations for the war, the draft extension acts, and the Tonkin Gulf Resolution, the court concluded that Congress had participated in the carrying on of the military action in Vietnam.

"Beyond determining that there has been *some* mutual participation between the Congress and the President,

which unquestionably exists here, with action by the Congress sufficient to authorize or ratify the military activity at issue, it is clear that the constitutional propriety of the means by which Congress has chosen to ratify and approve the protracted military operations in Southeast Asia is a political question." *Id.* at 1043; *accord* Berk v. Laird, 429 F.2d 302 (2d Cir. 1970).

Although the First Circuit's decision in Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971), has been cited for the proposition that questions concerning the war are justiciable, a close examination of the opinion does not support such conclusion. That court did in some detail examine whether the power in question had been textually committed to a coordinate branch of government.

But, while it appeared to reach the merits of the controversy whether the President had exceeded his powers under the Constitution, the opinion indicates that the Court in fact found the issue to be non-justiciable:

"As to the power to conduct undeclared hostilities beyond emergency defense, then, we are inclined to believe that the Constitution, in giving some essential powers to Congress and others to the executive, committed the matter to both branches, *whose joint concord precludes the judiciary from measuring a specific executive action against any specific clause in isolation.*" *Id.* at 33. (Emphasis added).

Although other lower federal courts have found certain of the issues presented by this court to be political and others not, we feel impelled to undertake an independent analysis of the principles derived from the Supreme Court cases.

We note first that the Constitution commits the entire foreign policy power of this country to the executive and legislative branches. Because the Constitution does not itemize all possible prerogatives in this field, it is a difficult task of interpretation to state categorically that the authority to perform

a particular act resides solely in either the executive or the legislature. *See* United States v. Curtiss-Wright Corp., *supra*. Justice Jackson, in the *Steel Seizure Cases, supra,* stated: "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, *but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.*" 343 U.S. at 637, 72 S.Ct. at 871 (concurring opinion) (emphasis added).

That this case falls within the "twilight zone" described by Justice Jackson would seem apparent, and to that extent it might be said that the questions presented are collectively political within the textual commitment test of Baker v. Carr, *supra*. However, taking the issues separately, it is possible to demonstrate that each is a political question within the criteria specified earlier.

## A. WHETHER THE AMERICAN PARTICIPATION IN SOUTHEAST ASIA IS A "WAR"

Plaintiffs have urged that because the Constitution gives to Congress the power "to declare war", this Court has the competence to evaluate the facts of our involvement in Southeast Asia against the constitutional standard of "war" and to determine whether we are engaged in a "war."

Although sufficient data might be gathered to enable a court to come to a reasoned answer whether we are engaged in a war, consideration of the three remaining factors leads us to the conclusion that the question whether American participation in Vietnam is a "war", is a political one.

▆▆ Denominating our military activities a "war" could lead to consequences in our foreign relations completely beyond the ken and authority of this Court to evaluate. It might be, for example, that such a decision by a federal court would be sufficient to activate formal treaty obligations between the United States and its allies, that, for very adequate policy reasons, the political branches may consider disadvantageous. Moreover, even if formal obligations did not exist, our allies, in their relationships with our newly declared formal "enemy", might be placed in an untenable position. A decision on the merits might also have an impact on domestic contractual relationships since the existence of a state of war can significantly alter duties under an agreement.[24]

Additionally, we can conceive of no set of judicially manageable standards to apply to reach a factual determination whether we are at war. Perhaps in 1787 it was possible to weigh a given set of factors and decide whether particular hostilities constituted war. However, the variety of hostilities possible in 1972, makes the formulation of rational standards a task not meet for the judiciary.

Finally, the Constitution has committed this assignment to the political branches. Congress has clearly been assigned the role of deciding when a formal declaration may be necessary, and the executive possesses the power authoritatively to find the facts when an emergency, such as an invasion or an insurrection, arises. *See, The Prize Cases,* supra. It is not insignificant in this regard that the courts that have considered the war-making power of the United States have all agreed that such power is shared by the executive and legislature to the exclusion of the courts.[25] To some extent this conclusion is predicated on the ability of the political branches to determine based on proper

---

24. Life insurance companies might not be obligated to pay benefits to the beneficiaries of individuals killed in Vietnam if it were held that this country is at war. See Jackson v. North America Assurance Soc., *supra*. A holding that this country is not at war might lead to suits challenging combat pay to members of the armed forces in Southeast Asia.

25. See cases discussed at pp. 41–45, *supra*.

factors, the existence of a war, and the constitutional commitment of that function to them.

## B. WHETHER CONGRESS HAS TAKEN SUFFICIENT ACTION TO AUTHORIZE THE WAR

Again, the court should spurn the invitation to make an independent study of the merits of this question.

■ With regard to this issue, plaintiffs have contended that Congress has continued to appropriate money and conscript men for the war not as an authorization for the military action but only because to do otherwise would risk the lives of Americans already in Southeast Asia. Congress is, of course, the only branch of government with the power to declare war. Implicit in this constitutional provision may be congressional authority to take steps short of a formal declaration of war, equivalent to an authorization.

But, to explore these issues would require the interrogation of members of Congress regarding what they intended by their votes, and then synthesization of the various answers. To do otherwise would call for gross speculation in a delicate matter pertaining to foreign relations.

As already stated, it would be impossible to gather and evaluate properly the information necessary for deciding whether Congress meant to authorize the military activities in Vietnam. Moreover, a set of rules restricting the discretion of Congress in this area could give rise to a situation in the future when, although Congress might conclude that taking no formal action is in the best interest of the country, court formulated rules would necessitate a formal

commitment lest the military action be enjoined. For this reason a set of standards cannot be rationally constructed.

■ Because the Constitution has given to Congress, and not the courts, the initial policy determinations whether to declare war formally and, if not, what steps to take short of formal declaration, we are bound not to enter the realm of foreign policy committed to another branch of government by adjudicating this question on the merits.

## C. WHETHER THE PRESIDENT IS JUSTIFIED IN MAINTAINING AMERICAN FORCES IN SOUTHEAST ASIA

■ Even if on the merits it were held that the United States is at "war" and that Congress has not authorized military action, the question would still remain whether the President has the power to maintain American forces in Southeast Asia. That this question would be necessary in a decision on the merits follows from the *Prize Cases, supra,* which held that in certain situations at least, even in the absence of a declaration of war or congressional approval, the President has extraordinary war-making powers, in that case the authority to declare a blockade as a matter of self-defense.[26] All four criteria compel the conclusion that we should decline to reach this question because of its political nature.

■ It is clear that weighty arguments can be mustered to support either side of the merits of the question whether the President has the authority to maintain American forces in Southeast Asia. This is so because modern technology has so altered global relationships that it is at least arguable by reasonable

26. We are, of course, mindful that in the view of the majority opinion in the *Prize Cases,* the United States had been attacked. As history marches on, however, situations justifying Presidential exercise of self-defense powers do not stand still. Instead, the rationale of the *Prize Cases* teaches that whether an "attack" has occurred for purposes of activating executive power to respond is exclusively a decision for the political branches. *See* Rehnquist, The President's Constitutional Authority to Order the Attack on the Cambodian Sanctuaries, reprinted in Lockhart, Kamisar, Choper, Constitutional Law 20 (Supp.1971); Note, 81 Harv.L.Rev. 1771, 1781–82 (1968).

men of good faith that our military presence in Vietnam is necessary to protect the security interests of the United States.[27] Under these circumstances—when plausible arguments tend to support either of two sides of the merits of a question concerning the foreign affairs field—a court should refrain from determining whether the President in making war has properly done so under the power committed to him by the Constitution.

First, the data necessary for such an evaluation regarding the nature of our military presence would be overwhelming. It would require a detailed examination of the political realities of that geographical area with special emphasis on determining the risks to the territorial sovereignty of our allies there, and assuming the loss of these allies, the risks to the territorial integrity of this country. A great deal of confidential information would be needed to attempt such an analysis, and without this evidence, it would not be sage for a court to undertake adjudication on the merits.

Second, although it might be asserted that a court could predict and evaluate the consequences of a determination on the merits, even those that could be accurately forecast and weighed have implications crucial to areas of foreign policy solely within the rightful domain of the political branches. They are implications for which the political branches must, under our system of government, stand responsible at the polls.

Third, while a court could possibly devise a manageable set of standards for answering the question in 1972, world politics today change so rapidly that it might, by setting forth rules, create a rigid matrix that would unnecessarily restrict the executive some time in the future when the powers denied today may be essential to the well-being of the United States then. This, of course, is one reason justifying a court's taking small steps in sensitive areas, because the judiciary lacks the flexibility, found in the political departments, to deal adequately with a constantly changing world scene.[28]

Additionally, under the "commitment" test, the executive clearly has been assigned broad power to make the policy decisions underlying any inquiry into the propriety of maintaining forces in Vietnam.

## V. CONCLUSION

The subject we deal with today is no dry, technical matter; it cuts deeply to the heart of the democratic process, and raises fundamental issues concerning the delicate balance underlying the separation of powers.

If the function of the federal courts were essentially no different from that of the executive branch, if the elements governing constitutional construction were substantially those undergirding the legislature, then perhaps our courts, which would under those conditions merely be another political branch, should have been made directly responsible to the electorate.

One critical line of legal thought discernible from Thayer through Holmes, from Brandeis through Frankfurter, has urged that courts serve democracy best by leaving the principal issues confronting the citizenry for decision to the political branches of the government. The law was not intended nor is it suited to

27. Commentators have for years grappled with the merits of this question and have, needless to say, differed on the conclusions to be drawn. Compare e. g. The Legality of United States Participation in the Defense of Viet Nam, 54 Dep't State Bull. 474 (1966) with e. g. Indochina: The Constitutional Crisis (The Yale Paper), 116 Cong.Rec. S 7117–S 7123 (daily ed. May 13, 1970); 116 Cong.Rec. S 7519–S 7593 (May 21, 1970); see generally Lofgren, War-Making Under the Constitution: The Original Understanding, 81 Yale L.J. 672 (1972); Note, 81 Harv.L.Rev. 1771, 1783–84 (1968); Symposium—Legality of United States Participation in the Viet Nam Conflict, 75 Yale L.J. 1085 (1966).

28. See generally, Bickel, The Least Dangerous Branch (1962).

be a mere substitute for politics. Nor, under our system of government, do the courts mirror in function or power the political departments. The law has its own qualities and must be true to itself. And perhaps its overriding, most enduring quality is a deep concern for reasoned process, not merely results.

The powers of the federal judiciary will be adequate to meet future burdens only if employed prudently, in recognition of the strengths as well as the possible limitations that inhere in our form of representative government. It seems that the often extraordinary character of public actions, and the dangerous implications they suggest for the proper functioning of our constitutional system, and in particular of the federal courts, make principled forbearance the touchstone of a wise judicial policy.

One of the plaintiffs' primary contentions is that a ruling by this Court that their attack on the constitutionality of the war presents a political question would leave the American people with no alternative branch of government to which they could resort for resolution of their grievance. The Constitution, however, contemplates an alternative remedy for the plaintiffs: Congress, the political branch to which our system of government has under our decision committed the resolution of these issues, can take some action to deal with what has been characterized as a usurpation of power by the President. Congress can, for example, pass resolutions expressing its concern regarding hostilities and setting forth its views pertaining to appropriate termination dates of combat.

Indeed, the history of recent Congressional sessions abounds with such proposed resolutions and bills and extensive debates regarding them.[29]

It is suggested that Presidential action with regard to Southeast Asia has for the last decade effectively reversed the roles contemplated by the Constitution for the executive and legislature in dealing with war. It should be clear, however, that Congress possesses whatever power is necessary to set right this supposed transposition of control.

In this regard, it would seem that to fight out questions concerning the wise use of executive authority in the forum of public opinion rather than to transfer such a contest to the judicial arena would more appropriately serve to vindicate the confidence and conviction of a democratic society without, at the same time, placing in jeopardy the balance envisioned by the separation of powers concept and adopted by our federal system.

The great power wielded by federal courts brings them close to the most sensitive areas of public affairs. As appeals from executive decisions or legislative actions become more frequent, judicial self-restraint looms ever more important. Otherwise, we shall begin to enter political domains far outside our competence and legitimate concern. Jefferson's opposition to judicial review, although never quite accepted, is still not so old that it may not be an apt admonition against confusing the political and the judicial functions.[30]

When Chief Justice Marshall came to Philadelphia in 1831 to accept a tribute

29. For example, there has recently been introduced into Congress a bill that would control executive deployment of American troops abroad. S.2956, 92nd Cong., 2d Sess. (1972).

30. At least partially in deference to the political branches, the Supreme Court has refused judicial enforcement of several clauses of the Constitution. In Kentucky v. Dennison, 24 How. (65 U.S.) 66, 16 L.Ed. 717 (1861), the requirement of Art. IV., Sec. 2 that states hand over fugitives from justice to each other on demand was held to be unenforceable in the courts. And as discussed earlier, the Court has consistently held that the Guaranty Clause is not subject to judicial scrutiny. See cases cited in n. 7, supra. In a slightly different context, Chief Justice Marshall acknowledged that cases arising under certain clauses of the Constitution might not confer jurisdiction on the Court, particularly one seeking to annul the grant of a patent of nobility by a State. Cohens v. Virginia, supra, 19 U.S. at 404–405, 5 L.Ed. 257.

from the Bar, he said "That [the Court] had never sought to enlarge the judicial power beyond its proper bounds * *." To do so here would run the risk of inflicting a grievous wound on our democratic system.

Since plaintiffs have asked what is beyond our province to consider, the motion to dismiss the complaints will be granted and counsel will submit appropriate orders accordingly.

JOSEPH S. LORD, III, Chief District Judge, dissents files an opinion.

JOSEPH S. LORD, III, Chief District Judge (dissenting).

I respectfully dissent from the majority's conclusion that this suit should be dismissed. Since I do not find that the subject matter involved here presents a non-justiciable political question, and I reject the government's other grounds in support of dismissal for the reasons stated in my opinion of March 28, 1972,[1] I would proceed to the merits.

Plaintiffs have alleged that the Executive has initiated and prosecuted major hostilities in Southeast Asia without the congressional authorization that is required by the Constitution. They claim that this is in violation of Art. I, Sec. 8, Cl. 11 which provides that "[t]he Congress shall have Power * ⁘ * To declare War * * *."

The legality of this war presents a serious and substantial constitutional question of interest to a great many citizens of this country. Once again a court has refused to provide an answer. Even though the plaintiffs have fulfilled all the constitutional and congressional requirements for jurisdiction and thus would seem to have a right to a federal forum to adjudicate their claims on the merits, they are told that their claims are non-justiciable. Traditionally, the courts in this country have provided a remedy when unconstitutional action by either the Legislature or the Executive has caused harm to citizens. The effect of the majority decision is to remove an entire provision of the Constitution from judicial scrutiny. This is not a provision of little consequence to the American people. The harm produced by most wars is of tragic proportions, as is no more readily evident than from the current hostilities in Southeast Asia. If the Executive or the Legislature acts unconstitutionally, it is not a sufficient remedy that at some future date on election day leaders may be replaced by those who hopefully will not violate the Constitution.

The duty of a court to judge whether acts of the other branches of government conform to the requirements of the Constitution when a proper case is presented to it has been established since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

"To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed * * *." Id. at 176.

The political question doctrine is a recognition that certain questions have been committed under our Constitution to the Executive or the Legislature to resolve in the exercise of unfettered discretion without judicial interference. Rather than being a device for judicial avoidance of questions, it is the outgrowth of a reasoned determination that another branch of the government has authority under our constitutional scheme to issue certain commands which may not be questioned as to their wisdom. *See* Tigar, Judicial Power, The "Political Question Doctrine", And Foreign Relations, 17 U.C.L.A.L.Rev. 1135 (1970). "The nonjusticiability of a political question is primarily a function of the separation of powers." Baker v. Carr, 369

---

1. Atlee v. Laird, 339 F.Supp. 1347 (E.D.Pa.1972).

U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed. 2d 663 (1962).

In its most recent explanation of the doctrine the Court made clear that the principal inquiry must be "whether there has been a textual commitment to a co-ordinate department of the Government" of the issue in question. Powell v. Mc-Cormack, 395 U.S. 486, 519, 89 S.Ct. 1944, 1963, 23 L.Ed.2d 491 (1969). When there is such a demonstrable commit-ment, the court will not second guess the other branch's decision on the matter. Thus, for example, in Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), the Court held that the Constitution commits to the execu-tive branch the power to recognize for-eign governments, and refused to ques-tion the determination by the President that the revolutionary government of General Carranza should be recognized in Mexico.

The doctrine of separation of powers dictates that certain issues be non-jus-ticiable out of proper deference to anoth-er branch of the government. However, when that branch exceeds its constitu-tional authority in its actions our sys-tem of separation of powers with its checks and balances dictates that a court proceed to the merits of a contro-versy.

> "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevita-ble friction incident to the distribu-tion of the governmental powers among three departments, to save the people from autocracy." Youngstown Sheet & Tube Company v. Sawyer, 343 U.S. 579, 613–614, 72 S.Ct. 863, 898, 96 L.Ed. 1153 (1952) (Frankfur-ter, J., Concurring), quoting Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Bran-deis, J., Dissenting).

While it is true that all matters of foreign relations are committed to ei-ther the Executive or the Legislative branch under our Constitution and that there are some twilight zone areas where responsibility is not clearly delin-eated, this does not mean that judicial inquiry is completely foreclosed. "[I]t is error to suppose that every case or controversy which touches foreign rela-tions lies beyond judicial cognizance." Baker, supra, 369 U.S. at 211, 82 S.Ct. at 707.

On more than one occasion, the courts have reviewed on the merits wartime ex-ecutive action which was claimed to be essential to national security. In the Prize Cases, 67 U.S. 635, 17 L.Ed. 459 (1863), the Court on the merits upheld President Lincoln's action in April, 1861 of declaring a blockade against the states making up the Confederacy. The Court decided that a state of civil war existed, and that the President acted within his constitutional powers as Com-mander-in-Chief in determining that the crisis required a blockade.

In Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the Court was faced with the question of whether President Truman's seizure of private steel mills during the Korean War exceeded his au-thority under the Constitution. The government's position was that the Pres-ident was acting under his executive and Commander-in-Chief powers as set forth in Article II of the Constitution. It was claimed that the safety and effectiveness of our troops fighting in Korea depend-ed on seizing the means of producing steel. The Supreme Court found no po-litical question difficulty and proceeded on the merits to rule President Tru-man's action unconstitutional, nullifying the seizure and issuing injunctive relief against the President's Secretary of Commerce.

Just last year during the current war in Southeast Asia the Court ruled on the merits that the Executive was not en-titled to an injunction against two news-papers which intended to publish the contents of a classified study entitled "History of U. S. Decision-Making Proc-ess on Viet Nam Policy." The govern-

ment claimed that disclosure of these documents would pose grave and irreparable danger to the security of the United States. A dissent by Mr. Justice Harlan, in which two other Justices joined, expressed the view that because of the constitutional primacy of the Executive branch in the field of foreign affairs, the judiciary should not question the Executive's determination of the impact that the disclosure would have on national security. Justice Harlan's position was that foreign policy decisions are matters in the domain of political power not subject to judicial intrusion or inquiry. The majority rejected this non-justiciable political question approach, however, and proceeded on the merits to hold that the Government had not met its heavy burden of showing justification for the imposition of a prior restraint on the press. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

In each case in which a court is confronted with the claim by a branch of the government that an issue is non-justiciable because it is a political question, the court must make an initial constitutional interpretation to determine whether the particular matter has been textually committed by the Constitution to that branch of the government. Baker, 369 U.S. at 211, 82 S.Ct. 691. If the court concludes that the matter has been so committed, further judicial inquiry is foreclosed.

The instant case concerns the hostilities in Southeast Asia in which this nation has been engaged for many years. There is little difficulty at this point in concluding that those hostilities constitute war within the meaning of Article I, Section 8, Cl. 11, and that we must evaluate the legality of defendant's actions in light of this constitutional provision. Orlando v. Laird, 317 F.Supp. 1013, 1018 (E.D.N.Y.1970), aff'd. 443 F.2d 1039 (C.A.2, 1971). When nations contend with force under the authority of their respective governments with the scope of troop commitment and casual-

ties involved here, the conflict must be considered war or the word has lost all meaning. *See* Bas v. Tingy, 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800); Prize Cases, *supra*; Note, Congress, The President, And The Power To Commit Forces To Combat, 81 Harv.L.Rev. 1771, 1803 (1968).

Art. I, Sec. 8, Cl. 11 on its face hardly seems to provide a textual commitment to the Executive to involve our nation in war. It states that "[t]he Congress shall have Power * * * To declare War * * *." Only if this was read in a very narrow manner as granting Congress simply the power to declare war formally, while leaving the initiative for undeclared wars to the Executive, could it be concluded that there has been a textual commitment to the Executive of the question of the wisdom of involving our nation in this war in Southeast Asia. This, however, has never been the interpretation given to that provision of our Constitution.

The Court early recognized that the power given to Congress was the exclusive means whereby the nation was to be committed to war. Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 2 L.Ed. 15 (1801), involved the question of the legality of the seizure of a French ship.

"In order, then, to decide on the right of Captain Talbot, it becomes necessary to examine the relative situation of the United States and France at the date of the recapture.

"The whole powers of war being, by the constitution of the United States, vested in congress, the acts of that body can alone be resorted to as our guides in this inquiry. It is not denied * * * that congress may authorize general hostilities, * * * or partial hostilities * * *." Id. at 28, 2 L.Ed. 15.

In Youngstown, *supra*, the Government in claiming Executive power to seize private steel mills asserted that the scope of Presidential power in dealing with foreign policy problems was most forcefully illustrated by the fact that President Truman had sent American

troops to Korea as an exercise of his constitutional powers. Though the question of the legality of the undeclared Korean War was not before the Court, Justice Jackson forcefully responded to this government assertion.

"* * * Thus, it is said he [President Truman] has invested himself with 'war powers'.

"I cannot foresee all that it might entail if the Court should indorse this argument. Nothing in our Constitution is plainer than that declaration of a war is entrusted only to Congress. Of course a state of war may in fact exist without a formal declaration. But no doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture." Id. 343 U.S. at 642–643, 72 S.Ct. at 873, 96 L.Ed. 1153 (concurring opinion).

The Second Circuit recently concluded that the war clause was intended to restrict the power of the Executive by requiring congressional authorization for the waging of war.

"History makes clear that the congressional power 'to declare War' conferred by Article I, section 8, of the Constitution was intended as an explicit restriction upon the power of the Executive to initiate war on his pre-

rogative which was enjoyed by the British sovereign." Berk v. Laird, 429 F.2d 302, 305 (C.A.2, 1970).[2]

This case does not involve second guessing the wisdom of the Executive in a matter committed by the Constitution to that branch of the Government. It is rather a constitutional question concerning the division of power within our system, involving a determination of whether the executive branch has exceeded the scope of its constitutional power. Other requisites for justiciability indicated in the Baker and Powell decisions are satisfied here. Concluding that the war making clause requires congressional authorization, the court can examine congressional legislation and determine whether authorization exists. The Executive has a constitutional "duty * * * [which] can be judicially identified and its breach judicially determined." Baker, 369 U.S. at 198, 82 S.Ct. at 700. The court would be involved in legal interpretations, a function which it is accustomed to performing. The question would be whether various acts of Congress such as appropriations bills and extensions of the Selective Service Act provide sufficient congressional authorization under the war making clause for the actions which have been taken by the Executive in Southeast Asia.[3]

A declaration of the present unconstitutionality of the war in Southeast Asia need not leave the government in the impossible position of having no lawful means to effectuate anything but a precipitous abandonment of our personnel

2. A recent law review article after an extensive analysis of the history of the passage of the war making clause concluded that this was its meaning at the time of adoption as "it was not understood in a narrow technical sense but rather as meaning the power to commence war, whether declared or not." Lofgren, War-Making Under the Constitution: The Original Understanding, 81 Yale L.Rev. 672, 699 (1972).

3. The Second Circuit has held that the form by which Congress authorizes a war is itself a "political question" not suited for judicial inquiry. It did con-

clude that congressional legislation has provided sufficient authorization or ratification for the current hostilities. Orlando v. Laird, 443 F.2d 1039 (C.A. 2, 1971). [However, as Judge Sweigert has pointed out, a strong case can be made for the plaintiffs' position that the Constitution requires an explicit, deliberate act of authorization and that appropriation acts and draft extensions are too ambivalent to supply the necessary constitutional authorization. This is the question properly to be decided on the merits. See Mottola v. Nixon, 318 F. Supp. 538 (N.D.Cal.1970).

now there.[4] The courts have ample power to prescribe appropriate steps to put an end to an unlawful enterprise without creating ridiculous and unmanageable situations. With the aid of the parties, a flexible equitable decree could be formulated, or if injunctive relief is deemed inappropriate a declaratory judgment could be issued.

While a remedy is no easy matter in this situation, the Supreme Court has indicated in the past that the courts will answer important constitutional questions of vital interest to the people despite problems encountered in formulating remedies when unconstitutional conduct is found. *See, e. g.,* Baker, *supra;* Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). If a constitutional violation is occurring here, the magnitude of harm is astounding. A court certainly has at least an equal responsibility to confront such problems as it does to prevent less serious usurpations of power by another branch of the government. I am in agreement with Judge Sweigert's observation that non-decision is especially inappropriate here in light of the Youngstown steel mills seizure case.

> "It seems to this court that to strike down as unconstitutional a President's wartime seizure of a few private steel mills but to shy away on 'political question' grounds from interfering with a presidential war, itself, would be to strain at a gnat, and swallow a camel." Mottola v. Nixon, 318 F. Supp. 538, 550 (N.D.Cal.1970).

While the Baker decision indicated that a factor in determining justiciability was the possible lack of respect for a coordinate branch of the government which a decision on the merits might seem to indicate,[5] the Court in Powell put such considerations to rest as it emphasized the traditional duty of the Court to interpret the law.

> "Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." Powell, 395 U.S. 486 at 549, 89 S.Ct. 1944, at 1978.

I would proceed to the merits; therefore, I dissent.

---

4. In fact, a decision of unconstitutionality might not result in an end to the war as some people have assumed. All that it would require is a conformance of governmental action to the requirement of the Constitution. "If we determine that the Indochina conflict is unconstitutional because it lacks a congressional declaration of war, the Chief Executive is free to seek one, as was President Truman free to seek congressional approval after our Steel Seizure decision." Massachusetts v. Laird, 400 U.S. 886, 899, 91 S.Ct. 128, 135, 27 L.Ed.2d 130 (1970) (Douglas, J., dissenting from denial of leave to file a bill of complaint).

