**ENCUENTRO DEL CANTO POPULAR, Accion Latina, Global Exchange, Pastors for Peace, Sylvia Sherman and Barbara Dane, Plaintiffs,**

v.

**Warren CHRISTOPHER, Secretary of State, Office of Cuban Affairs, a division of the United States Department of State, Marc Susser, Desk Officer, Office of Cuban Affairs, Dennis Hays, Coordinator, Office of Cuban Affairs and Karl Wagner, Vice Consul, U.S. Interests Section of the Department of State, Havana, Cuba, Defendants.**

No. C–93–4221–VRW.

United States District Court,
N.D. California.

April 22, 1996.

Abraham A. Simmons, Bronson Bronson & McKinnon, San Francisco, CA, James R. Mayock, Carol A. King, William T. Martinez, San Francisco, CA, for Encuentro Del Canto Popular, Accion Latina, Global Exchange, Sylvia Sherman, Barbara Dane.

David V. Bernal, Office of Immigration Litigation DOJ, Washington, DC, Susan L. Kamlet, U.S. Attorney's Office, Oakland, CA, for Warren Christopher, Office of Cuban Affairs, Marc Susser, Dennis Hays, Karl Wagner.

## ORDER.

WALKER, District Judge.

In August 1993, members of the Cuban musical group Grupo Mezcla requested visas which would allow them to tour the United States. Only three of the eight band members were granted visas, and the group's tour was cancelled. Plaintiffs now challenge this decision.

Plaintiffs Accion Latina, Pastors for Peace and Global Exchange are the non-profit organizations that sponsored Grupo Mezcla's United States tour. Plaintiff Encuentro Del Canto Popular is an annual festival held in San Francisco at which Grupo Mezcla was scheduled to perform. Named as defendants are Secretary of State Warren Christopher, the Office of Cuban Affairs, Marc Susser and Dennis Hays (employees of the Office of

Cuban Affairs) and Karl Wagner, Vice Consul at the United States Interests Section of the State Department in Havana.

## I

On August 23, 1993, the Immigration and Naturalization Service approved a petition for a "P" nonimmigrant visa for Grupo Mezcla; this petition had been filed by plaintiffs Encuentro Del Canto Popular and Accion Latina. The approved visa petition was then sent to the United States Interests Section of the State Department in Havana, Cuba, for review. On September 30, 1993, members of Grupo Mezcla were interviewed in Havana by defendant Wagner, a Vice Consul in the U.S. Interests Section. At the time of the interview, Wagner allegedly told the Grupo Mezcla members that he did not anticipate any problem with their applications.

On October 8, 1993, the U.S. Interests Section in Havana allegedly notified the State Department that the members of Grupo Mezcla were ineligible for admission under 8 U.S.C. § 1182(f) and Presidential Proclamation 5377. Title 8 U.S.C. § 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Presidential Proclamation 5377, which was signed by President Reagan on October 4, 1985, and which was based on the authority vested in him "as President by the Constitution and laws of the United States of America, including section 212(f) of the Immigration and Nationality Act of 1952, as amended [8 U.S.C. § 1182(f) ]," provides in pertinent part:

> [e]ntry of the following classes of Cuban nationals as nonimmigrants is hereby suspended: * * * (b) individuals who, notwithstanding the type of passport that they hold, are considered by the Secretary of State or his designee to be officers or employees of the Government of Cuba or the Communist Party of Cuba.

See 50 Fed.Reg. 41329. Defendants now assert that consular officials at the U.S. Interests Section in Havana independently concluded that the members of Grupo Mezcla were ineligible for visas under Proclamation 5377 and requested a security advisory opinion from the State Department only *after* reaching their own conclusion on the applicability of that Proclamation.

On November 2, 1993, the State Department sent a telegram to the U.S. Interests Section allegedly "concurring" in the Consular Officers determination that visa applications for five of the eight members should be denied under § 1182(f). This telegram also stated that the State Department had no objection to the issuance of visas to the remaining three members because, although they were considered by the Secretary to be employees of the Cuban government, the Secretary had also determined that their performance in the United States would not affect United States interests.

Plaintiffs filed the instant action on November 30, 1993, claiming that defendants, by denying visas to the group's members, exceeded the authority granted to them by statute and impinged on plaintiffs' First Amendment rights to freedom of association, speech and religion. Defendants now move for summary judgment, arguing that they acted within the scope of their authority and that the exclusion of certain members of Grupo Mezcla was made in accordance with valid law. For the reasons stated below, defendants' motion is GRANTED IN PART and DENIED IN PART.

## II

Summary judgment is a method for the prompt disposition of an action in which there is no genuine issue of material fact. FRCP 56(c) provides for the granting of summary judgment where the moving party is entitled to judgment as a matter of law. The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a

directed verdict at trial, FRCP 56(e) shifts to the nonmoving party the burden of presenting specific facts showing that such contradiction is possible. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir. 1978), *cert denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

A party opposing summary judgment may not rest upon the mere allegations or denials of his pleadings. Rather, responses, either by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. A mere "scintilla" of evidence supporting the nonmoving party's position will not suffice. There must be enough of a showing that the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The question on summary judgment motions is whether reasonable minds could differ as to the import of the evidence. *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1288 (9th Cir.1987). "If the evidence is merely colorable * * * or is not significantly probative, summary judgment may be granted." Id at 1288. The nonmoving party's evidence is to be taken as true and all inferences are to be drawn in the light most favorable to the nonmoving party. *Eisenberg,* 815 F.2d at 1289.

### III

Plaintiffs' complaint attacks both the substance of defendants' decision to exclude certain members of Grupo Mezcla and the process through which that decision was reached. Plaintiffs first argue that defendants' exclusion decision was erroneous as a matter of substantive immigration law because it rested on Proclamation 5377, which plaintiffs claim has been invalidated or superseded by two pieces of subsequent legislation: (1) § 901 of the Foreign Relations Authorization Act for Fiscal Years 1988 and 1989 (the 1988 Act) and (2) 8 U.S.C. § 1182(a)(3)(C), which was added to the INA in 1990. Plaintiffs at times refer to 8 U.S.C. § 1182(f) as being invalid as well, although they provide no authority or argument for this rather startling assertion. The court therefore construes all of plaintiffs' assertions that § 1182(f) is invalid as an alternative phrasing of their argument that Proclamation 5377 is invalid.

Plaintiffs also claim that Proclamation 5377 is invalid on its face because it contains no expiration date. Because Proclamation 5377 is allegedly invalid, plaintiffs argue that the exclusions which were based on it are necessarily invalid as well.

Plaintiffs argue, as well, that even if Proclamation 5377 remains valid authority for defendants' exclusion decision, the procedure through which defendants reached that decision was defective. First, plaintiffs claim that defendants did not provide a facially legitimate reason for their exclusion decision. Second, plaintiffs claim that defendants violated 8 U.S.C. §§ 1103(a), 1104(a), 1201(a) and 1202 by allowing the Secretary of State to "usurp" the authority of the consular officials in Cuba by requiring those officials to adopt a presumption that all professional entertainers are employees of the Cuban Government and by requiring those officials to seek a "security advisory opinion" from the Secretary before making their exclusion decisions. Finally, plaintiffs claim that defendants purposely waited until the last minute to deny the visas, thus preventing any "meaningful appeal" or correction of application and thereby chilling plaintiff's first amendment rights.

Although defendants have moved for summary judgment on the entire complaint, they have largely limited the arguments to asserting (1) Proclamation 5377 remains valid law and (2) defendants had a facially legitimate and bona fide reason for their decision to deny the visa requests of the excluded members of Grupo Mezcla. Defendants first argue that 8 U.S.C. § 1182(a)(3)(C) by its terms does not apply to this case. Defendants next argue that § 901 of the 1988 Act in no way invalidated or superseded Proclamation 5377. Defendants finally argue that they have provided a facially valid and bona fide reason for excluding members of Grupo Mezcla under Proclamation 5377. Because they have provided such a reason, and because they acted pursuant to valid law, defendants claim that their exclusion decision was neither "arbitrary and capricious" nor in excess of their statutory authority, thus enti-

tling them to summary judgment. Defendants have not explicitly addressed plaintiffs' claim that the Secretary has illegally "usurped" the authority of consular officials by requiring them to seek security advisory opinions in all cases implicating Proclamation 5377, nor have they explicitly addressed plaintiffs' claim that the Secretary "chilled" plaintiff's first amendment rights by unduly delaying the visa decision in this case.

## A

### 1

■ The first of plaintiffs' two broad arguments is that Proclamation 5377 has been superseded both by amended § 1182(a)(3)(C) and by the 1988 Act. Defendants are correct in their assertion that this argument is meritless to the extent it relies on 8 U.S.C. § 1182(a)(3)(C).

Congress added § 1182(a)(3)(C) to the INA in 1990. Clause (i) of § 1182(a)(3)(C) added a ground for the exclusion of certain aliens by the Secretary, specifying that "[a]n alien whose entry or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is excludable." This additional ground for exclusion was qualified in clause (iii) of § 1182(a)(3)(C), which provides "[a]n alien * * * shall not be excludable or subject to restrictions or conditions on entry into the United States *under clause (i)* because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States" (emphasis added). Plaintiffs now argue that clause (iii) of § 1182(a)(3)(C) prevented defendants from excluding the excluded members due solely to their association with the Cuban government.

Plaintiffs' argument is meritless. As noted above, the excluded members of Grupo Mezcla were excluded under Proclamation 5377, which President Reagan issued based both on his constitutionally-granted authority over foreign affairs and on his authority over immigration granted by Congress in 8 U.S.C. § 1182(f). The excluded members, in other words, were denied visas based on the *President*'s authority under the constitution and 8

U.S.C. § 1182(f), not based on the *Secretary*'s authority under § 1182(a)(3)(C)(i). Since § 1182(a)(3)(C)(iii) merely limits exclusions entered pursuant to the Secretary's authority under § 1182(a)(3)(C)(i), it has no bearing on this case.

Plaintiffs' arguments otherwise are unavailing, as is their contention that § 1182(a)(3)(C)(iii) embodies a Congressional policy which extends the limitations of that clause to the rest of the INA and to the President's constitutional powers. The plain language of § 1182(a)(3)(C)(iii) explicitly limits its application to § 1182(a)(3)(C). The court must look to the plain language of a statute before attempting to divine the Congressional "intent" behind that statute. See *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)) ("where * * * the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'"). Because the plain language of § 1182(a)(3)(C)(iii) explicitly limits its applicability to exclusions entered under § 1182(a)(3)(C)(i), the former clause of § 1182(a)(3)(C) has no applicability to this case and cannot support plaintiffs' argument that defendants acted contrary to law when they denied visas to the excluded members.

### 2

■ Defendants are also correct in their argument that Proclamation 5377 was not invalidated or superseded by § 901 of the 1988 Act, which provided:

Notwithstanding any other provisions of law, no alien may be denied a visa or excluded from admission into the United States, subject to restriction or conditions or entry into the United States, or subject to deportation because of any past, current or expected beliefs, statements or associations which, if engaged in by a United States Citizen in the United States, would be protected under the Constitution of the United States.

Although the above language is quite broad, the legislative history to the 1988 Act makes clear that it was not intended to limit the President's authority to control immigration

when necessary to maintain national security or achieve foreign policy objectives. Accordingly, the conference committee noted:

> [under section 901] the executive branch would retain the ability to exclude or deport aliens on criminal, espionage, and terrorism grounds (among others), and, in certain circumstances, on national security and foreign policy grounds. But national security or foreign policy exclusion would not be permitted if such exclusion or deportation were based on beliefs, statements, or associations which would be constitutionally protected if engaged in by U.S. citizens in the United States. * * *
>
> *Finally, the conferees do not intend this section to be viewed as in any way affecting the existing authority of the President to deny admissions by proclamation* or to deny entry to aliens when the United States is at war or during the existence of a national emergency proclaimed by the President.

House Conference Report No. 100–475, p. 163–64 (committee print) (emphasis added).

The legislative history to § 901 thus makes it crystal clear that § 901 was not intended to diminish the President's traditional authority to control through proclamation immigration which affects the nation's foreign policy. This clear Congressional intent notwithstanding, plaintiffs now argue that the plain language of § 901 must be read to invalidate Proclamation 5377 as it was applied in this case. As noted above, the court must apply the plain language of a statute before looking to the Congressional intent behind that statute. See *Ron Pair Enterprises*, 489 U.S. at 241, 109 S.Ct. at 1030. The court must therefore address plaintiffs' argument that the plain language of § 901 superseded or invalidated Proclamation 5377.

a

█ In order properly to assess plaintiffs' argument, the court must first explore the manner in which Congress and the President share authority over immigration which implicates national security. Congress has plenary and exclusive authority over immigration. See U.S. Const., Article I, § 8. The President, on the other hand, has exclusive authority to direct the country's foreign affairs. See *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 319–20, 57 S.Ct. 216, 221,

81 L.Ed. 255 (1936) (discussing the "very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations * * * a power which does not require as a basis for its existence an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution"). Thus, when an alien's request to enter the United States has possible repercussions on the United States' relationships with other nations, both Congress and the President have constitutional authority to act.

The courts have recognized that the President possesses independent authority over immigration which implicates international relations. Thus, in *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1949), the Court upheld § 1182(f) against a challenge that it constituted an illegal delegation of legislative power. In so doing, the court noted that "there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. * * * When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." See also *Haitian Refugee Center, Inc. v. Gracey*, 600 F.Supp. 1396 (D.D.C.1985).

In light of the above authority, plaintiffs' argument that § 901 invalidated Proclamation 5377 must be approached with caution. President Reagan enacted Proclamation 5377 based partly on his inherent Constitutional authority to do so. Given this, a Congressional attempt completely to invalidate that Proclamation by enacting § 901 would raise a thorny constitutional question whether or to what extent the President's power over foreign affairs must yield to Congress' power over immigration in cases in which both areas are implicated. As courts have long recognized, such delicate constitutional questions are to be addressed only when there is

no other method of resolving a case. See, for example, *American Foreign Service Association v. Garfinkel*, 490 U.S. 153, 161, 109 S.Ct. 1693, 1698, 104 L.Ed.2d 139 (1989) ("we emphasize that the District Court should not pronounce on the relative constitutional authority of Congress and the Executive Branch unless it finds it imperative to do so. Particularly where, as here, a case implicates the fundamental relationship between the Branches, courts should be extremely careful not to issue unnecessary constitutional rulings"). Before the court can address plaintiffs' argument that § 901 impliedly invalidated Proclamation 5377, then, it must first consider whether § 901 applies to the facts of this case.

b

The court concludes that § 901 does not apply to this case. Section 901 prohibits exclusions only when they are based on "any past, present or expected * * * associations which, if engaged in by a United States citizen in the United States, would be protected by the United States Constitution." The excluded members in this case were excluded under § 1(b) of Proclamation 5377, which suspends entry of Cuban nationals "who, notwithstanding the type of passport they hold, are considered to be * * * employees of the Government of Cuba * * *." It follows that the denial of visas to the excluded members could offend § 901 only if employment by the Cuban government is an "association[ ] which, if engaged in by a United States citizen in the United States, would be protected by the United States Constitution."

Plaintiffs' argument in support of the contention that employment by the Cuban government is an association which would be protected by the First Amendment if engaged in by a United States citizen in the United States is made in two steps. First, plaintiffs argue that because the Cuban government is "the quinticenntial [sic] political organization, a U.S. citizen's association with it presumptively enjoys the maximum amount of protection afforded under the Constitution." Pl.Supp.Brief at 1. Next, plaintiffs argue that "the manner in which [the excluded members] sought to associate was by 'employment,' a type of association which, even when given its typical meaning,

enjoys plenary protection under the Constitution." Id. Because employment is protected, and because association with the Cuban government is protected, plaintiffs argue that employment by the Cuban government must also be protected.

Plaintiffs' argument, while containing a certain surface appeal, is flawed. Courts have long recognized a qualitative difference between informal associations with a foreign government or political association and actual employment by such an entity. It is true that informal associations with foreign governments, entities or people are entitled to at least some degree of First Amendment protection. See, for example, *Lamont v. Postmaster General of the United States*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (declaring unconstitutional a statute allowing the Post Office to open, read and detain foreign correspondence deemed "communist propaganda"); *Adams v. Baker*, 909 F.2d 643 (1st ·Cir.1990) (recognizing First Amendment right of U.S. citizens to associate with president of Sinn Fein). It is also true, however, that the courts have repeatedly upheld laws which have limited the right of U.S. citizens to work for or represent foreign governments.

For example, in *Attorney General v. Irish Northern Aid Committee*, 346 F.Supp. 1384, 1390–91 (S.D.N.Y.), affirmed without opinion, 465 F.2d 1405 (2d Cir.), cert. denied, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972), the court upheld the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq., against a First Amendment challenge. FARA provides that no person shall act as an "agent of a foreign principal" unless he has filed with the Attorney General a true and complete registration statement. 22 U.S.C. § 612. "Agent of a foreign principal" is defined as "any person who acts as an * * * employee * * * of a foreign principal * * * and who * * * engages within the United States in political activities for or in the interests of such foreign principal * * * [or] * * * within the United States solicits [or] collects * * * money or other things of value for or in the interest of such foreign principal." 22 U.S.C. § 611(c). "Foreign principal" is defined as "a government of a

foreign county and a foreign political party." 22 U.S.C. § 611(b). Thus, FARA requires employees of foreign governments to register with the Attorney General when they engage in political activities or fund-raising for their government within the United States.

In *Irish Northern Aid Committee,* the plaintiffs argued that FARA violated the First Amendment. The plaintiffs pointed to *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that the NAACP's membership list was protected from disclosure by the First Amendment absent a showing of a valid state purpose for the disclosure to balance against the members' First Amendment rights. 346 F.Supp. at 1390. The *Irish Northern Aid Committee* court acknowledged that the plaintiffs before it had a similar First Amendment right to keep private the information which FARA forced them to share with the Attorney General, but held that this right was clearly outweighed by the government's need for the information. *Id.* The court noted that FARA was "founded upon the indisputable power of the Government to conduct its foreign relations and to provide for the national defense." *Id.* The court also noted that defendant's "fund raising and propaganda activities may well be designed to influence American policy or, put most charitably, may result in serious complications for the Government in the conduct of its foreign affairs." *Id.* at 1391. Because FARA was designed to assist the government in the conduct of foreign relations, the court concluded that the government's interest in the information "may fairly be said to outweigh any possible infringement of the First Amendment rights of the defendant's members or contributors." *Id.*

Similarly, in *Palestine Information Office v. Shultz,* 853 F.2d 932 (D.C.Cir.1988), the court upheld against First Amendment challenge the closing of the Palestine Information Office under the Foreign Missions Act, 22 U.S.C. § 4301 et seq. In *PIO,* the State Department designated the information office for the Palestinian Liberation Organization as a foreign mission within the meaning of the Act and informed it that it would have to cease all operations within 30 days. *Id.* at 935. A United States citizen who worked for the office sued, arguing that the closure violated his First Amendment right to associate with the PLO. *Id.* at 940.

The court rejected this argument and noted that by making it the plaintiff "ask[ed] this court to adopt an interpretation of the right to free association that is far broader than any the Supreme Court has ever endorsed." *Id.* at 941. The court continued:

> The right to free association * * * is not an absolute; nowhere is that clearer than when measuring the rights of an American citizen to serve as an official representative of a foreign nation or other entity. * * * In considering appellants' claim about the right to associate with the PLO, we must weigh their interests against those of the government. * * * The associational interest of appellants is minimal to nonexistent. * * * [The closing does not] prevent them from associating with any individual or group of individuals. It does not even prevent them from "associating" with the PLO in the normal sense of that word. It does not, for example, ban them from speaking with members of the PLO. It simply prevents them from acting as the organization's foreign mission. No court has ever found in the right to freedom of association a right to *represent* a foreign entity on American soil.

*Id.* (emphasis in original). Concluding that whatever free association rights plaintiffs may have possessed were outweighed by the "strong interest of the government in 'defending the country against foreign encroachments and dangers,'" *id.* at 941–42, quoting *Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972), the *PIO* court held that the closing of the PIO under the Foreign Missions Act did not violate plaintiffs' rights under the First Amendment. *Id.* at 942.

Finally, the Supreme Court has upheld against constitutional challenge the Cuban Assets Control Regulations, 31 C.F.R. § 515 et seq., which prohibit "all dealings in * * * any property * * * by any person subject to the jurisdiction of the United States" and which define "property" to include "contracts of any nature whatsoever, [and] services." 31 C.F.R. §§ 515.311, 515.201(b)(1). See *Regan v. Wald,* 468 U.S. 222, 104 S.Ct. 3026, 82

L.Ed.2d 171 (1984). While *Regan* did not involve a First Amendment attack on the Regulations, its holding nonetheless underscores the President's immense power to regulate or even prevent the association of United States citizens with foreign governments when he feels such regulation is necessary to achieve foreign policy objectives. The *Regan* Court thus noted that "[m]atters relating to the conduct of foreign relations are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" and held that the Regulations' infringement on the Fifth Amendment right to travel was "justified by weighty concerns of foreign policy." *Id.* at 242, 104 S.Ct. at 3038.

The above cases make clear that the First Amendment right to associate with a foreign government must give way when that association takes on a formal or representative nature and when the political branches determine that such association must be regulated in order to effectuate the nation's foreign policy. Just as the *Irish Northern Aid Committee* court held that the First Amendment right to be an "employee" of a foreign principal must yield to the government's overriding foreign policy concerns, and just as the *PIO* court held the same regarding the First Amendment right to be a "representative" of a foreign entity, the court concludes that whatever associational right a United States citizen might have under the First Amendment to be an employee of the Cuban government is not "protected by the United States Constitution" from regulation by the political branches designed to implement the nation's foreign policy.

It follows from the above conclusion that § 901 of the 1988 Act, by its very terms, did not affect the validity of Proclamation 5377 as applied in this case. The "association" for which the excluded members were excluded was employment by the Cuban government. That association would not be protected by the Constitution from government regulation if engaged in by a United States citizen in the United States. Plaintiffs' argument that § 901 invalidated Proclamation 5377 therefore fails, at least to the extent that Proclamation 5377 excludes aliens because they are "employees" of the Cuban government.

Plaintiffs, moreover, appear to have abandoned the argument, put forth in their complaint, that Proclamation 5377 is invalid because it does contain an expiration date. Plaintiffs have never identified any authority for the proposition that Presidential Proclamations must contain expiration dates, nor has the court discovered such authority. Thus, even if plaintiffs still assert this argument, it does not change the court's conclusion that defendants are entitled to summary judgment on the issue of Proclamation 5377's validity. Defendant's motion for summary judgment is therefore GRANTED to the extent plaintiffs seek a declaration that Proclamation 5377 is invalid or that there was no legal basis for denying visas to the excluded members.

**B**

Having concluded that the law under which the excluded members of Mezcal were excluded was valid, the court must now turn to the second of plaintiffs' broad arguments: their claim that the manner in which the exclusion was affected was improper. Plaintiffs have three arguments to this effect. First, plaintiffs argue that the exclusion was improper because it was not made until the "last minute," thus preventing the excluded members from supplementing their applications or pursuing a meaningful appeal. Second, plaintiffs argue that the exclusion decision was improper because it was in fact made by the Secretary, not the consular officer, in violation of 8 U.S.C. §§ 1103(a), 1104(a), 1201(a) and 1202. Finally, plaintiffs argue that the exclusion decision was improper because it is not supported by a "facially legitimate and bona fide reason" as required by *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). The court will address these arguments in turn.

**1**

Plaintiffs first argue that the exclusion decision was improper because it was made "at the last minute;" that is, because the excluded members were allegedly notified of the exclusion decision only three days before they were scheduled to perform in this country. Plaintiffs claim that this last-minute denial is "suspicious" and claim that a

pattern of such last-minute denials exists in Cuban visa cases. Plaintiffs also claim that this pattern has "an unconstitutional chilling effect" on their First Amendment rights.

Plaintiffs have failed to provide the court with any authority for the proposition that defendants, when they choose to deny a request for a visa, must do so with sufficient speed that the visa applicant is not forced to change his scheduled arrival and departure dates in order to appeal that decision or present additional evidence. Nor have plaintiffs submitted a shred of evidence in support of their theory that defendants have a "practice" of last-minute denials. It is true that discovery has yet to commence in this action, which may explain plaintiffs' lack of evidence. If plaintiffs needed to conduct discovery before they resisted defendants' current motion, however, they should have sought a continuance of this motion by filing an affidavit under FRCP 56(f). Their failure to do so means that they cannot rely on a lack of discovery as an excuse for their failure to present evidence which creates a genuine issue of material fact.

■ The court's authority to review defendants' decision to deny visa requests is very narrow. See generally *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953) (the power to exclude aliens is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control"). Given this narrow scope of review, the court declines plaintiffs' invitation to review every aspect of defendants' decisions which strikes plaintiffs as "suspicious." Because plaintiffs have cited no authority for the proposition that the court has jurisdiction to review the speed with which defendants processed the visa applications of the excluded members, the court declines to engage in such a review. Accord *Kummer v. Shultz*, 578 F.Supp. 341 (N.D.Tex.1984) (court has no jurisdiction to order the Secretary to "diligently and expeditiously" process a visa application). Defendants' motion for summary judgment on this claim for relief is therefore GRANTED.

2

■ Plaintiffs next argue that the exclusion decisions were improper because they were made by the Secretary, not a consular official. Plaintiffs correctly point out that the INA vests consular officials with exclusive authority to issue visas. See, for example, 8 U.S.C. § 1201(a) ("a consular officer may issue * * * (2) to a nonimmigrant who has made proper application therefor, a nonimmigrant visa"); 8 U.S.C. § 1104(a) ("The Secretary of State shall be charged with the administration and the enforcement of the provision of this chapter and all other immigration and nationality laws relating (1) to the powers, duties and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or denial of visas* ") (emphasis added). Plaintiffs claim that this language and similar language elsewhere in the INA prevents the Secretary from interfering with the decision of a consular official to grant or refuse a visa; they also claim that the Secretary so interferes in Cuban visa cases by requiring consular officials to adopt a presumption that all professional entertainers are employees of the Cuban Government and to seek security advisory opinions in all such cases.

Defendants have not challenged plaintiffs' legal contention that the Secretary would violate the INA if he "usurped" the consular official's discretion in awarding or refusing the visas requested in this case. Moreover, defendants have not put forth undisputed facts which allow only the conclusion that the consular officials in this case made their decision to deny the visas without interference from the Secretary. Compare Dillard Decl, ¶ 3 (consular section of the U.S. Interests Section in Havana prepared telegram to State Department in which excluded members were deemed ineligible for admission under § 1182(f) due to employment with the Cuban government) with Martinez Decl., ¶¶ 6–9 (after initial interviews, Vice Consul Wagner "left the distinct impression that everything went well and that a favorable decision should be expected" by October 15, 1993; visas were later denied). Given defendants' failure to make such a showing, the court cannot say that they have shown that they are entitled to judgment as a matter of law on plaintiffs' "usurpation" claim. Defendants' motion for summary judgment is

therefore DENIED on plaintiffs' claim that the Secretary interfered with or usurped the consular officials' role in deciding whether to grant the visa requests of the excluded members.

3

■ Plaintiffs finally argue that the decision to deny visas to the excluded members was improper because it was not supported by a "facially legitimate and bona fide reason" as required by *Kleindienst.* Defendants argue that such a reason is present in this case. Before the court addresses the dispute whether such a reason is present in this case, however, it must first determine the extent of its jurisdiction to look behind the visa denials, a determination which is intimately connected with the determination discussed above whether a consular official made the decision to deny the visas or whether that decision was somehow "usurped" by the Secretary.

■ It is well established that the decision of a consular official to deny an alien's request for a visa, even if erroneous, is immune from judicial review. See, for example, *Li Hing v. Levin,* 800 F.2d 970, 971 (9th Cir.1986); *Ventura–Escamilla v. INS,* 647 F.2d 28 (9th Cir.1981); see also *Kleindienst,* 408 U.S. at 766, 92 S.Ct. at 2583–84 (recognizing Congress' plenary power to exclude aliens from the United States without judicial intervention). Thus, if the decision to deny the visa requests of the excluded members was made by a consular officer, the court lacks jurisdiction to review or alter that decision in any way.

■ The harm which confers standing upon plaintiffs in this case is the denial of an opportunity to associate with the excluded members. If the court is prohibited from reviewing the exclusion decision, it will also lose its ability to redress plaintiff's harm. Since a cognizable harm gives plaintiffs standing to sue only when the relief sought will redress that harm, see generally *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), it follows that the court's inability to review the visa denials will terminate plaintiffs' standing to bring the instant action. See *Allen,* 468 U.S. at 760, 104 S.Ct. at 3329 (absent a showing of a specific, redressable injury, "a federal court * * * is not

the proper forum to press general complaints about the way in which the government goes about its business"). In other words, if the court concludes that a consular official made the decision to deny the excluded members' visa requests, it will lose subject matter jurisdiction over all of the other challenges which plaintiffs have brought to the manner in which Cuban visa applications are allegedly processed by defendants, including the challenge to the Secretary's alleged requirement that consular officials seek security advisory opinions in every case. Accord *Garcia v. Baker,* 765 F.Supp. 426, 427 (N.D.Ill.1990) (court lacked jurisdiction to issue a declaration that consular official misinterpreted law and violated regulations by not seeking a security advisory opinion before denying a visa application; the "suit beg[an] and end[ed] with the consular official's denial of [the] immigrant visa application").

If the court concludes that the visas were denied by the Secretary, however, it will be faced with a much different case. As noted above, both parties assume that *Kleindienst* gives the court the power to review an exclusion decision by the Secretary to determine whether it is supported by a "facially legitimate and bona fide reason." The court is not so certain that the *Kleindienst* test applies to the instant case.

*Kleindienst* and the cases which have followed it, such as *Adams v. Baker,* 909 F.2d 643 (1st Cir.1990), *Allende v. Shultz,* 845 F.2d 1111 (1st Cir.1988) and *Abourezk v. Reagan,* 785 F.2d 1043 (D.C.Cir.1986), aff'd, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987), have all been concerned with exclusion decisions made under 8 U.S.C. §§ 1182(a) and (d). Section 1182(a) lists several classes of aliens who are excludable and ineligible for admission into the United States. Section 1182(d), however, significantly limits these bases for exclusion by allowing most of them to be waived by the Attorney General upon recommendation of the Secretary or a consular officer. As a practical matter, then, § 1182(d) makes most exclusion decisions under § 1182(a) a matter of the Attorney General's discretion. Section 1182(a) thus represents a significant delegation by Congress to the Executive of Congress' power over immigration.

The plaintiffs in *Kleindienst* challenged the Attorney General's exercise of that power. In that case Ernest Mandel, a Belgian journalist and Marxist theoretician, was excluded under former § 1182(a)(28),[1] which among others excluded aliens who "advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship." 408 U.S. at 755, 92 S.Ct. at 2578. While the Secretary of State recommended to the Attorney General that this exclusion be waived, the Attorney General declined to do so after the INS reported to him that Mandel had in previous trips to the United States abused "the opportunities afforded him to express his views in this country." *Id.* at 759, 92 S.Ct. at 2580.

The plaintiffs, United States citizens who had invited Mandel to this country, challenged the exclusion on the grounds that it violated their associational rights under the First Amendment. After concluding that plaintiffs had standing to challenge Mandel's exclusion, the Court turned to the question whether an exclusion decision was amenable to judicial review. Noting that "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens," *id.* at 766, 92 S.Ct. at 2583, the court observed that Congress could have enacted a blanket prohibition against entry of all aliens described in § 1182(a)(28) and that plaintiffs' First Amendment rights to associate with such aliens could not have overridden that prohibition. *Id.* at 767, 92 S.Ct. at 2584.

Because Congress had not issued such a blanket prohibition in § 1182(a), however, but rather had provided for waiver under § 1182(d), the court concluded that a limited degree of judicial review was appropriate. The court held that "plenary congressional power to make policies and rules for exclusion of aliens has long been firmly estab-

lished. In the case of an alien excludable under [§ 1182(a)(28) ], Congress has delegated conditional exercise of this power to the Executive. * * * when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion * * *." *Id.* at 769–70, 92 S.Ct. at 2585.

*Kleindienst* thus based its "facially legitimate and bona fide reason" test on the conclusion that the Attorney General's decision to waive or not waive a ground for exclusion set forth in the INA was the exercise of a delegated Congressional power. Cases directly applying the *Kleindienst* test in the context of challenged waiver decisions, or citing it as authority for judicial review of exclusion decisions in other contexts, have accordingly conducted their review by comparing the reasons for exclusion put forth by the government—and the evidence supporting those reasons—to the language of the INA. These cases, in other words, have sought to determine whether the Executive, in exercising its Congressionally delegated authority to exclude aliens, has exceeded the scope of that authority.

In *Adams,* for example, the plaintiffs argued that Gerry Adams, the leader of Sinn Fein, had been deemed excludable and denied a waiver under § 1182(a) merely because of his membership in Sinn Fein, in violation of the 1988 Act and the McGovern Amendment. 909 F.2d at 648. The court rejected this argument and upheld the Attorney General's decision to deny a waiver after it found that the Attorney General's decision was based on evidence that Adams was involved in terrorist violence and not merely on the fact that Adams was a member of Sinn Fein. *Id.* at 648–49.

Similarly, in *Abourezk* the plaintiffs argued that several foreign officials and teachers had been improperly deemed excludable under § 1182(a)(27).[2] 785 F.2d at 1048–49. The

---

1. Section 1182(a) has been extensively reorganized and amended since the *Kleindienst* case, most notably in 1990 when its 34 classes of excludable aliens were reduced to 9 broader classes. The precise language of § 1182(a)(28) no longer appears in the INA.

2. Exclusion under § 1182(a)(27), which was directed to all aliens "who the consular officer or

the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States," was *not* one of the grounds which could be waived by the Attorney General under § 1182(d). By its very terms, however, § 1182(a)(27) vested discretion to exclude aliens

court conducted its review of the Attorney General's decision by analyzing the Secretary's construction of subsection (27) under the test put forth in *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and concluded that more evidence was required before the statutory interpretation issue could be fully addressed. *Id.* at 1053–56.

The *Adams* and *Abourezk* courts thus reviewed exclusion decisions made under § 1182(a), which the *Kleindienst* court characterized as a delegation of power to the executive. Because this delegation of power was conditioned by the plain language of the INA, the *Adams* and *Abourezk* courts were able to judge the exercise of delegated power by the Executive against limits which Congress itself had placed on that exercise, such as those found in the 1988 Act or the McGovern Amendment. The text of the INA itself, in other words, provided the *Adams* and *Abourezk* courts with the standard against which to judge the challenged Executive action for legality. See also *Etuk v. Slattery,* 936 F.2d 1433, 1443 (2d Cir.1991) (noting that "[w]hile in general the Executive Branch is permitted to exercise broad discretion on immigration matters, Congress can impose limits on the exercise of that discretion" and citing *Kleindienst* as authority for existence of jurisdiction to review INS policies alleged to be contrary to provisions of the INA).

The current exclusion, which was made under § 1182(f), presents a much different case. The delegation of power to the President in § 1182(f) is much broader than is the delegation of power to the Attorney General in § 1182(a). Moreover, as noted above, Congress in subsequent amendments to the INA has taken pains *not* to limit the discretion of the President to exclude aliens by proclamation under § 1182(f). Given both the extremely broad grant of discretion to

the President in § 1182(f) and the President's own inherent powers in this area, the court finds it likely that this case is distinguishable from *Kleindienst, Adams, Abourezk* and other cases which have applied *Kleindienst's* "facially legitimate and bona fide reason" test to decisions by the Executive concerning immigration.[3] The court further concludes that review of the Secretary's decision to deny the visa requests of the excluded members—if indeed the Secretary made that decision—is likely precluded by the political question doctrine.

■ Courts have long recognized that many, but not all, questions concerning foreign relations are nonjusticiable "political questions." Thus, the Court in *Baker v. Carr* observed that when faced with a question arising in the field of foreign relations courts should conduct "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action" in order to determine whether that question is justiciable. 369 U.S. 186, 211–12, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962). In *Baker,* the Court set out a six-factor test designed to expose the fundamental attributes of the political question doctrine, concluding as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable or manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect

---

in the Attorney General, and thus the rationale for applying *Kleindienst* to exclusion decisions made under § 1182(a)(27) appears identical to the rationale for applying *Kleindienst* to waiver denials made under § 1182(d).

**3.** The *Abourezk* court itself appeared to recognize this distinction. In a footnote, that court noted that limiting the Executive's discretion to exclude aliens under § 1182(a)(27) would not necessarily

render the Executive helpless to exclude aliens whose mere entry into the country might threaten the country's foreign policy interests, since such aliens could still be excluded under the President's "sweeping proclamation power." 785 F.2d at 1049 n. 2. The court also suggested, but did not hold, that an exclusion which violated the INA when made under § 1182(a)(27) would not be so violative if made under Proclamation 5377. *Id.*

due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not "political cases." 369 U.S. at 217, 82 S.Ct. at 710.

At least three of the above factors appear to be implicated by plaintiffs' request that the court determine whether the Secretary had a "facially legitimate and bona fide reason" for his conclusion that the excluded members were properly considered employees of the Cuban government.[4] First, there is a distinct lack of judicially manageable standards to guide the court in resolving the question whom the Secretary may properly consider to be an employee of the Cuban Government. Certainly neither § 1182(f) nor Proclamation 5377 provide the court with "objectively manageable standards," see *Orlando v. Laird*, 443 F.2d 1039 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), which the court could use to determine whom the Secretary may properly consider to be such an employee. Nor is it apparent to where the court could turn to discover such standards. The common law and statutory definitions of employment familiar to courts of the United States are all organized around the central principle inherent in private ownership of property and freedom of labor. These definitions are problematic in the case of the excluded members, who are citizens of a socialist state in which the dividing line between public ownership of property and restraint of labor, on the one hand, and private ownership of property and freedom of labor, on the other, is much less distinct.

Second, if the court were to choose a definition of employment against which to judge the Secretary's conclusion that the excluded members were employees of the Cuban Government, that choice by the court would appear to be "an initial policy determination of a kind clearly for nonjudicial discretion." A weighing of the complex political and economic considerations that determine which foreign nationals should be considered employees of their governments appears to be a matter clearly reserved for the discretion of Congress or the Executive, not the court.

Finally, this case appears to present a situation in which there exists "an unusual need for unquestioning adherence to a political decision already made." Although it is the denial of visas to the excluded members which has conferred standing upon plaintiffs, plaintiffs have admitted that their ultimate goal in this lawsuit is much broader than merely overturning that denial; rather, plaintiffs have brought this action as a "test case" designed to change the manner in which *all* Cuban visa cases are handled. See Pl.Opp. to Motion to Dismiss at 1. Moreover, in order to accept plaintiffs' invitation to inquire whether the Secretary has provided a "facially legitimate and bona fide reason" for his decision to invoke Proclamation 5377 in this case, the court would necessarily first have to declare that the Secretary may not legally presume that certain classes of Cuban professionals, including professional entertainers, are employees of the Cuban government. It is therefore apparent that granting the relief requested by plaintiffs could significantly limit the Secretary's discretion to deny visas to Cuban nationals and thus significantly alter the United State's foreign policy towards Cuba. Courts applying the political question doctrine have recognized that the resolution of questions with such important international consequences is best left to the political branches. See *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C.Cir. 1979); *Atlee v. Laird*, 347 F.Supp. 689, 702 (E.D.Pa.1972) (three-judge court), aff'd summarily, 411 U.S. 911, 93 S.Ct. 1545, 36

---

4. Although the "constitutionally committed" factor would also appear to weigh in favor of nonjusticiability in this case, courts have held that this factor should be deemphasized in cases involving foreign relations. See *Olegario v. United States*, 629 F.2d 204, 217 (2d Cir.1980); *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931, 946 (N.D.Cal.1975); *Atlee v. Laird*, 347 F.Supp. 689, 703 (E.D.Pa.1972), aff'd summarily, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

L.Ed.2d 304 (1973); *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931, 947 (N.D.Cal.1975).

The court concludes that the political question doctrine would likely prevent it from inquiring whether the Secretary had a "facially legitimate and bona fide reason" for his decision to deny visas to the excluded members. See *American–Arab Anti–Discrimination Committee v. Reno*, 70 F.3d 1045, 1056 (9th Cir.1995) (recognizing that the political branches have "great discretion to determine which aliens to exclude from entering this country"). This conclusion notwithstanding, the court declines to rule at this time on the applicability of the political question doctrine to this case. This caution is warranted by the fact that the court has raised the potential applicability of this doctrine sua sponte; the parties should be given an opportunity to advise the court on this point before a ruling is issued. This caution is also warranted by the fact that such a ruling may be unnecessary; as noted above, if defendants can put forth undisputed facts which show that a consular official made the decision to deny the excluded members' visa requests, the case will be at an end without the need to consider the court's jurisdiction to review the Secretary's decision.

Given the uncertainty surrounding whether the court may or need address whether the Secretary had a "facially legitimate and bona fide reason" for his decision to deny the excluded members' requests for visas, the court declines to address that question at this time. Defendants' motion for summary judgment is therefore DENIED WITHOUT PREJUDICE to the extent that motion requests a judgment that the Secretary had a "facially legitimate and bona fide reason" for his decision. The court shall resume consideration of this aspect of defendants' motion as appropriate.

## IV

In sum, the court ORDERS as follows:

(1) Defendants' motion for summary judgment is GRANTED on plaintiffs' claim that Proclamation 5377 is invalid;

(2) Defendants' motion for summary judgment is GRANTED on plaintiffs' claim that defendants acted contrary to law by unduly delaying consideration of the visa requests;

(3) Defendants' motion for summary judgment is DENIED WITHOUT PREJUDICE on plaintiffs' claim that defendants acted contrary to law when defendant Warren Christopher or his agents interfered with or usurped the authority of the consular officials in Havana to make decisions regarding visa applications; and

(4) Defendants' motion for summary judgment is DENIED WITHOUT PREJUDICE on plaintiffs' claim that defendants did not have a facially legitimate and bona fide reason for their decision to deny the requested visas.

(5) The parties may conduct discovery on plaintiffs' "usurpation" claim only. When conducting this discovery, the parties should focus in particular on developing the testimony of the consular officials responsible for making the visa decisions which are challenged in this case.

The parties may file further summary judgment motions on plaintiffs' "usurpation" claim no later than July 19, 1996. Opposition briefs to these motions shall be due no later than July 26, 1996, and reply briefs shall be due no later than August 2, 1996. The motions shall then be submitted for decision without oral argument unless the parties are notified otherwise. Civil LR 7–1. If the parties are of the opinion that plaintiffs' "usurpation" claim cannot be resolved on summary judgment, they shall so notify the court of this fact no later than July 5, 1996.

IT IS SO ORDERED.